Filed 2/19/15

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E060962 |
| v. | (Super.Ct.Nos. APP1300100 and RIM1216935) |
| ANTHONY A. HARRIS, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Becky Dugan, Judge. Affirmed.

Michael J. Kennedy for Defendant and Appellant.

Steven L. Harmon, Public Defender, Joseph J. Martinez, Deputy Public Defender, for the Riverside County Office of the Public Defender, and Bartell & Hensel, Donald J. Bartell, Lara J. Gressley and Jared D. Bartell for the California DUI Lawyers Association as Amici Curiae on behalf of Defendant and Appellant.

Paul E. Zellerbach and Michael Hestrin, District Attorneys, and Matt Reilly, Deputy District Attorney, for Plaintiff and Respondent.

I.

INTRODUCTION

In *Missouri v. McNeely* (2013) 569 U.S. ___ [133 S.Ct. 1552] (*McNeely*), the United States Supreme Court held that, before the police may conduct a nonconsensual blood test of a motorist who is arrested on suspicion of driving under the influence of alcohol (DUI), the police must either obtain a warrant from a detached magistrate or later show that exigent circumstances prevented them from timely obtaining a warrant. (133 S.Ct. at p. 1563.) The high court also held that the natural dissipation of alcohol in a driver's bloodstream does not create exigent circumstances in every case, and that the government must show on a case-by-case basis that a warrantless blood draw was reasonable under the Fourth Amendment to the United States Constitution. (*Id.* at pp. 1563, 1568.)

In this case, defendant and appellant Anthony A. Harris appealed from the denial of his motion to suppress evidence obtained during a blood test taken after he was arrested on suspicion of DUI. The superior court appellate division affirmed the order denying defendant's motion to suppress. The appellate division did not address whether exigent circumstances supported the warrantless blood test because the People did not argue that exigent circumstances existed, and because the court concluded defendant consented to the test after the arresting officer advised defendant of the consequences of refusing to submit. The appellate division held that *McNeely* did not foreclose consensual blood tests conducted under the implied consent law, and that defendant's voluntarily and freely given consent satisfied the Fourth Amendment.

We transferred the appeal from the superior court appellate division to decide an important issue of statewide importance and to secure uniformity of decision and, thereafter, we directed the parties to submit supplemental briefs addressing, inter alia, the impact of *McNeely* on this case. (Cal. Rules of Court, rules 8.1002, 8.1012(a)(1).) We conclude that *McNeely* does not govern defendant's case; that actual consent to a blood test satisfies the Fourth Amendment; that defendant's submission to the blood test in this case was freely and voluntarily given and did not violate the Fourth Amendment; and that the record contains substantial evidence that defendant's blood draw was conducted in a reasonable manner.

Even assuming that *McNeely* is applicable and that defendant's warrantless blood test may only be supported by exigent circumstances, which the People did not argue and the facts do not demonstrate, we conclude that the evidence in this case may not be suppressed because the good faith exception to the exclusionary rule applies here. Defendant's blood test was taken before the United States Supreme Court decided *McNeely*, and at a time when the California courts uniformly held that probable cause of DUI and the natural dissipation of alcohol or drugs in the bloodstream was sufficient to justify a warrantless blood test. Because the police obtained defendant's blood sample without a warrant in reliance of binding precedent, excluding the evidence in this case would not achieve the exclusionary rule's purpose of deterring future Fourth Amendment violations.

Therefore, we affirm the order denying defendant's motion to suppress.

II.

FACTS AND PROCEDURAL HISTORY

On December 13, 2012, the People charged defendant by misdemeanor complaint with one count of driving a motor vehicle under the influence of a drug or alcohol (Veh. Code, § 23152, subd. (a)), and with one count of being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a)). Defendant pleaded not guilty to both charges at his January 14, 2013 arraignment, and on March 22, 2013, he filed a motion to suppress evidence.[1] (Pen. Code, § 1538.5.)

A.    *Motion to Suppress*

In his written motion, defendant asserted that, incident to his arrest on suspicion of DUI, "he was forced to submit to a blood test." Defendant argued that the People bore the burden of establishing that the warrantless search was reasonable under the Fourth Amendment, and that the blood test was conducted in a reasonable manner.

In its opposition, the People argued the warrantless search in this case was reasonable under the Fourth Amendment because, contrary to the suggestion in the

---

[1] By not filing his motion to suppress no later than 45 days after pleading not guilty, defendant arguably forfeited his right to pretrial review of the denial of his motion. (Pen. Code, § 1510.) In its brief filed in the superior court appellate division, the People argued that defendant's failure to comply with Penal Code section 1510 meant that his notice of appeal was untimely. That statute governs the availability of pretrial review of denial of an order denying a motion to suppress, and has nothing to do with the timeliness of a notice of appeal. (See Cal. Rules of Court, rule 8.853(a) [providing the normal time in which to appeal a judgment or appealable order in misdemeanor cases].) Because the People did not move to dismiss defendant's pretrial appeal on the basis that he did not comply with Penal Code section 1510, we need not address that issue further.

motion to suppress, defendant was not forced to submit to the blood test but consented to it. The People also argued the blood test was performed in a reasonable manner because it was conducted by a trained professional and was observed by an experienced drug recognition expert. Finally, anticipating that defendant would rely on the recently decided decision in *McNeely*, the People argued that, even if the search was invalid under *McNeely*, the trial court should apply the good faith exception to the exclusionary rule because the search was conducted under then-existing law that a blood draw based on probable cause of DUI did not require a warrant or a separate showing of exigent circumstances.

At the hearing on defendant's motion, Deputy Robinson of the Riverside County Sheriff's Department testified that at approximately 5:00 p.m. on October 16, 2012, he was on motorcycle patrol near the transition of the 60 and 215 freeways. Deputy Robinson paced defendant's silver Honda driving approximately 90 miles per hour, and witnessed the vehicle crossing all four lanes of traffic without using a turn signal. He testified the vehicle was traveling well over the 65 miles per hour speed limit, and that crossing all four lanes without using a turn signal was an unsafe maneuver. Deputy Robinson initiated a traffic stop.

Using the loud speaker on his motorcycle, Deputy Robinson directed defendant to pull over to the right shoulder. Defendant did not follow Deputy Robinson's direction, and instead came to a stop in the center median of the freeway. Deputy Robinson dismounted from his motorcycle, approached defendant, and asked for defendant's driver's license and vehicle registration. While speaking to defendant, Deputy Robinson

5

observed objective symptoms of impairment with a stimulant.  Defendant had a flushed, rigid face, his pupils were dilated, his eyes were bloodshot and watery, and he made "jerky movements."  Therefore, Deputy Robinson asked defendant to get out of his vehicle so Deputy Robinson could perform field sobriety tests.

Deputy Robinson testified that he was an expert in drug recognition, that he was trained in administering and interpreting the results of field sobriety examinations, and that he had advanced training in DUI investigations.  Deputy Robinson conducted the horizontal gaze nystagmus examination, the Romberg examination, and other traditional field sobriety tests on defendant.  Based on defendant's performance on those examinations, Deputy Robinson concluded that defendant was under the influence of a controlled substance and, he placed defendant under arrest.

Deputy Robinson told defendant that, based on the deputy's belief that defendant was under the influence of a drug, defendant was required to submit to a chemical blood test.  Deputy Robinson advised defendant that he did not have the right to talk to a lawyer when deciding whether to submit to the chemical test, that refusal to submit to the test would result in the suspension of his driver's license, and that refusal could be used against him in court.  Defendant responded, "okay," and Deputy Robinson testified that at no time did defendant appear unwilling to provide a blood sample.  Deputy Robinson was transported by another deputy to the Moreno Valley Sheriff's station.

At the sheriff's station, a phlebotomist with whom Deputy Robinson had previously worked drew defendant's blood.  Deputy Robinson observed the phlebotomist swab the inside of defendant's right elbow with what appeared to be a disinfectant.  The

6

phlebotomist then obtained a blood sample from defendant using a hypodermic syringe. Deputy Robinson testified that defendant did not resist the blood draw or say, "no, I don't want to do this." The phlebotomist packaged the sample, and Deputy Robinson placed it into the station's blood depository.

On cross-examination, Deputy Robinson testified that he did not attempt to obtain a warrant before the blood test was conducted on defendant. He also testified that he twice told defendant that he was required to submit to the blood test.

Defendant testified that his blood was drawn while he was inside "kind of a holding cell." He also testified that his hands were handcuffed behind his back and to a bar on his seat when his blood was drawn, and that Deputy Robinson was not present at the time.

On cross-examination, defendant testified that he had used a "very little" amount of methamphetamine on the day of his arrest. When asked if he had taken any ecstasy, defendant said he took one pill two days earlier. Defendant testified that, other than making him feel alert, he felt fine from the methamphetamine. Finally, defendant testified that the methamphetamine he took that day and the ecstasy he took earlier in the week had no effect on his memory or on his ability to perceive the events happening around him.

Defendant's attorney argued that, under *McNeely*, "a search warrant is required for drunk driving blood draws." He characterized as "absurd" the People's argument that the blood draw was consensual. "The officer said, 'You are required to do this.' If an officer comes to your door and says, 'You are required to let me in,' so you stand back so they

7

can come in, that is not a consensual entry." Counsel also argued the People introduced no evidence that the blood draw was conducted in a medically approved manner.

After hearing solely from defense counsel, the trial court denied the motion. With respect to defendant's argument that the blood draw was not consensual, the court noted, "You're right, it's not consensual in the sense there [are] repercussions if you refuse. He doesn't deny or dispute he was told that. He was told, you are required to take this, and if you don't take it, X, Y, and Z will follow as a consequence if you refuse. [¶] He chose not to refuse because he didn't want all of the consequences. Is that a forced consent? Sure it is. Is it legal? Yes."

B.     *Appeal to the Appellate Division of the Superior Court*

Defendant appealed to the appellate division of the superior court from the order denying his motion to suppress. (Pen. Code, § 1538.5, subd. (j).) In his brief, defendant argued the trial court erred by denying his motion to suppress because *McNeely* reaffirmed the holding in *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*) that a blood draw in DUI cases requires either a warrant or exigent circumstances above and beyond the natural dissipation of alcohol or drugs in the blood, and that the blood sample taken in this case was supported by neither. He also argued the People did not introduce evidence that the blood sample was taken in a professional manner and in a medical setting, as mandated by *Schmerber*, and that blood draws taken by police contractors in a police station do not satisfy the Fourth Amendment. Finally, defendant argued the blood test was not consensual because his submission was coercively obtained pursuant to the

8

implied consent law and did not constitute free, voluntary, and unequivocal consent for purposes of the Fourth Amendment.

In its respondent's brief, the People argued that, notwithstanding *McNeely*, consent is a recognized exception to the warrant requirement, and the search in this case was reasonable under the Fourth Amendment because defendant did, in fact, consent to the search. The People argued that consent to a blood test given after being advised of the consequences of refusal is not coerced. With respect to the manner in which the blood draw was conducted, the People argued that defendant's reliance on *Schmerber* was misplaced because, according to the People, that decision set forth the constitutional requirements for a nonconsensual blood draw and did not address the manner in which a consensual blood draw must be taken. In any event, the People argued the defendant's blood was drawn "in the usual, commonplace manner." Finally, the People argued in a footnote that, if the appellate division were to conclude that the blood draw violated defendant's Fourth Amendment rights, under the good faith exception to the exclusionary rule the evidence should not be suppressed.

In a partially published *per curiam* opinion, the superior court appellate division affirmed the denial of defendant's motion to suppress. (*People v. Harris* (2014) 225 Cal.App.4th Supp. 1 (*Harris*).) In the published portion of the decision, the appellate division noted that, prior to *McNeely*, California courts uniformly interpreted *Schmerber* as permitting forced blood draws based solely on probable cause of DUI because the natural dissipation of alcohol or drugs in the blood was itself an exigent circumstance. (*Id*. at p. Supp. 5.) The appellate division concluded that *McNeely* "repudiated the long-

standing California interpretation of *Schmerber*." (*Id*. at pp. Supp. 5-6.) Because the

People did not argue that defendant's blood draw was supported by exigent

circumstances, the appellate division did not address whether such circumstances

existed.[2] (*Id*. at Supp. 6.) Instead, the appellate division focused on whether defendant's

consent to the blood draw satisfied the Fourth Amendment independent of *McNeely*.

(*Ibid*.)

Although the appellate division concluded that *McNeely* did not rule out

consensual blood draws, the court concluded that *McNeely* forced a reexamination of the

implied consent law and narrowed the circumstances under which a warrantless, forced

blood draw may be justified under the implied consent law. (*Harris*, *supra*, 225

Cal.App.4th at p. Supp. 7.) The court concluded that, after *McNeely*, "a warrantless

[blood] test in the absence of case-specific exigent circumstances can comply with the

[implied consent] statute if done cooperatively, but now violates the Fourth Amendment

if done forcibly." (*Ibid*.) The court also concluded that actual consent to a blood draw

pursuant to the informed consent law is freely and voluntarily given notwithstanding that

the motorist gives consent in the face of administrative and criminal penalties for refusing

to consent. (*Id*. at pp. Supp. 8-10.) Because the defendant cooperated with the police and

"never, at any point, gave either the slightest resistance or suggestion that he wished to

---

[2] In a footnote, the appellate division wrote it would also not consider whether the good faith exception to the exclusionary rule applied to defendant's blood draw because the People did not argue the exception. (*Harris*, *supra*, 225 Cal.App.4th at p. Supp. 6, fn. 2.) As we explain, *post*, we disagree with the appellate division on that point and conclude the People sufficiently preserved the good faith exception argument for appeal.

revoke his consent," the appellate division ruled that the blood draw did not violate the Fourth Amendment. (*Id*. at p. Supp. 10.)

In an unpublished portion of the opinion, the appellate division ruled that the blood draw was performed in a medically reasonable manner.

By order dated May 16, 2014, this court, on its own motion, certified the appeal for transfer.[3] This court subsequently granted a request from the People that the parties be permitted to submit supplemental briefs, and granted requests from the Riverside County Office of the Public Defender and the California DUI Lawyers Association (CDLA) for permission to file amici curiae briefs.

III.

DISCUSSION

A.    *Standard of Review*

""""In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. We review the court's resolution of the factual inquiry under the deferential substantial-evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review." [Citation.] On appeal we consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision.

---

[3] The Supreme Court denied requests to depublish the opinion of the appellate division. (*People v. Harris* (June 11, 2014, S218034) 2014 Cal. Lexis 3862.)

11

[Citations.]'" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364-365, quoting *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.)

"Under the current provisions of the California Constitution, evidence sought to be introduced at a criminal trial is subject to suppression as the fruit of an unconstitutional search and seizure 'only if exclusion is . . . mandated by the federal exclusionary rule applicable to evidence seized in violation of the Fourth Amendment [of the United States Constitution].'" (*People v. Maikhio* (2011) 51 Cal.4th 1074, 1089, quoting *In re Lance W.* (1985) 37 Cal.3d 873, 896; see Cal. Const., art I, § 28, subd. (f)(2).)

B.      *Defendant's Warrantless Blood Draw Did Not Violate the Fourth Amendment Because He Freely and Voluntarily Consented to a Chemical Test, and It Was Conducted in a Reasonable Manner*

Defendant contends that a warrantless blood draw may only be justified under the Fourth Amendment by a showing of exigent circumstances, and that submission to a chemical test under the implied consent law does not constitute valid consent for purposes of the Fourth Amendment. We conclude that actual consent to a blood draw does satisfy the Fourth Amendment; that admonition under the implied consent law of the consequences of refusing to submit to a chemical test does not always result in coerced consent; and that, under the totality of the circumstances, defendant freely and voluntarily agreed to submit to a blood draw. Finally, we conclude the blood draw was conducted in a reasonable manner. Therefore, we find no Fourth Amendment violation.

12

1.   The Fourth Amendment Does Not Mandate That All Warrantless Blood Draws Be Supported by Exigent Circumstances

"The Fourth Amendment provides:  [¶]  'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'"  (*Riley v. California* (2014) 573 U.S. ___ [134 S.Ct. 2473, 2482].)

"The Fourth Amendment generally requires police to secure a warrant before conducting a search."  (*Maryland v. Dyson* (1999) 527 U.S. 465, 466, citing *California v. Carney* (1985) 471 U.S. 386, 390-391.)  Put another way, "[t]he Fourth Amendment demonstrates a 'strong preference for searches conducted pursuant to a warrant . . . .'"  (*Ornelas v. United States* (1996) 517 U.S. 690, 699, quoting *Illinois v. Gates* (1983) 462 U.S. 213, 236.)  "[I]t is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  (*Mincey v. Arizona* (1978) 437 U.S. 385, 390, quoting *Katz v. United States* (1967) 389 U.S. 347, 357 (*Katz*), fns. omitted.)

On two occasions, the United States Supreme Court has addressed whether a warrantless blood test in a DUI case violated the Fourth Amendment.  In *Schmerber*, the defendant was taken to the hospital following an automobile accident and, against his express refusal on the advice of counsel, the police directed a physician to draw

13

defendant's blood to be tested for the presence of alcohol.  (*Schmerber*, *supra*, 384 U.S. at pp. 758-759.)  Among other things, the United States Supreme Court in *Schmerber* addressed whether the warrantless blood test violated the Fourth Amendment.  The high court concluded that "compulsory administration of a blood test" was a search under the Fourth Amendment.  (*Id*. at p. 767.)  Although "there was plainly probable cause" to arrest the defendant on suspicion of DUI, the court found that the search could not be justified as a search incident to arrest because the cases articulating that exception to the warrant requirement "have little applicability with respect to searches involving intrusions beyond the body's surface."  (*Id*. at pp. 768-769.)

The court in *Schmerber* noted that "[s]earch warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned."  (*Schmerber*, *supra*, 384 U.S. at p. 770.)  However, the court concluded that the arresting officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence,' [citation]." (*Ibid*.)  The high court acknowledged "that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system," and because the defendant had to be rushed to the hospital and the officers had to investigate the accident scene, it concluded "there was no time to seek out a magistrate and secure a warrant."  (*Id*. at pp. 770-771.)  Under those "special facts," the court held that the warrantless search was justified.  (*Id*. at p. 771.)

More recently, in *McNeely*, the defendant refused to take a breathalyzer test during a DUI investigation and again when being transported to the police station, in order to measure his blood-alcohol concentration (BAC), so the arresting officer transported the defendant to a nearby hospital. (*McNeely*, *supra*, 133 S.Ct. at pp. 1556-1557.) At the hospital, the arresting officer read an admonition to the defendant under the Missouri implied consent law, and "explained to [the defendant] that under state law refusal to submit voluntarily to the test would lead to the immediate revocation of his driver's license . . . and [his refusal] could be used against him in a future prosecution. [Citation.]" (*Ibid.*) The defendant refused to submit to the blood test so the arresting officer directed a laboratory technician to draw a blood sample. (*Id.* at p. 1557.) The United States Supreme Court granted certiorari in *McNeely* to resolve a split in authority on the question of "whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." (*Id.* at pp. 1556, 1558.)

The majority in *McNeely* held that the natural dissipation of alcohol in the bloodstream does not create exigent circumstances in every DUI case. (*McNeely*, *supra*, 133 S.Ct. at pp. 1563, 1568 (maj. opn. of Sotomayor, J.).) "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so. [Citation.]" (*Id.* at p. 1561.) Although the court had no "doubt that some circumstances will make obtaining a warrant impractical

15

such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test," the high court held that the state was required to make such a showing under the totality of the circumstances and on a case-by-case basis. (*Id.* at pp. 1561, 1563.)

*McNeely* had no occasion to address whether a warrantless blood draw is reasonable under the Fourth Amendment under another exception to the warrant requirement. In both *McNeely* and *Schmerber*, the defendants refused to consent, so the sole issue in those cases was whether exigent circumstances supported nonconsensual searches. Nor, as defendant and amici curiae seem to suggest, did the court in *McNeely* hold that a warrantless blood test is reasonable under the Fourth Amendment *only* when exigent circumstances are present. "'"It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered."' [Citations.]" (*People v. Knoller* (2007) 41 Cal.4th 139, 154-155; accord, *Cooper Industries v. Aviall Services* (2004) 543 U.S. 157, 170 ["'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents'"].) Therefore, we must determine whether another recognized exception to the warrant requirement will justify defendant's blood draw.

2. <u>Actual Consent to a Blood Draw Satisfies the Fourth Amendment</u>

Having concluded that *McNeely* did not hold that warrantless blood draws may only be justified under the Fourth Amendment by establishing exigent circumstances under the totality of the circumstances, we conclude that free and voluntary submission to

16

a blood test, after receiving an advisement under the implied consent law, constitutes actual consent to a blood draw under the Fourth Amendment.

The exigent circumstances doctrine is not the only recognized exception to the general requirement of obtaining a warrant before conducting a search. "It is 'well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.'" (*People v. Woods* (1999) 21 Cal.4th 668, 674, quoting *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219 (*Schneckloth*); see *Katz*, *supra*, 389 U.S. at p. 358, fn. 22 ["A search to which an individual consents meets Fourth Amendment requirements"]; *Fernandez v. California* (2014) ___ U.S. ___ [134 S.Ct. 1126, 1137] ["A warrantless consent search is reasonable and thus consistent with the Fourth Amendment irrespective of the availability of a warrant"]; *People v. Ledesma* (1987) 43 Cal.3d 171, 233 (*Ledesma*) ["Failure to comply with the warrant requirement is . . . not fatal when consent is given"].)

As noted, the high court in *McNeely* had no occasion to address whether consent to a chemical test satisfies the Fourth Amendment because the defendant in that case expressly refused to submit to a blood draw. (*McNeely*, *supra*, 133 S.Ct. at p. 1557.) However, a plurality of the court acknowledged, without deciding, that a motorist's consent will justify a warrantless blood draw. In response to the assertion that application of the totality of the circumstances analysis rather than a per se exigency rule based on the natural dissipation of alcohol "will undermine the governmental interest in preventing and prosecuting drunk-driving offenses," the plurality noted that "States have a broad range of legal tools to enforce their drunk-driving laws and to secure BAC

17

evidence without undertaking warrantless nonconsensual blood draws." (*Id.* at pp. 1565-1566 (plur. opn. of Sotomayor, J.).) Chief among these tools, "all 50 states have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drink-driving offense. [Citations.] Such laws impose significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution. [Citations.]" (*Id.* at p. 1566 (plur. opn. of Sotomayor, J.).)

Although the plurality in *McNeely* discussed state implied consent laws as a means of legally obtaining blood samples in DUI investigations, we agree with the Wisconsin Court of Appeals that the concept of "implied consent" in this context is confusing and somewhat unhelpful in determining whether a motorists' voluntary submission to a chemical test constitutes valid Fourth Amendment consent. Therefore, we quote that court's helpful observations. "'Implied consent' is not an intuitive or plainly descriptive term with respect to how the implied consent law works. We suspect that it is a source of confusion. On occasion in the past we have seen the term 'implied consent' used inappropriately to refer to the consent a driver gives to a blood draw at the time a law enforcement officer requires that driver to decide whether to give consent. However, actual consent to a blood draw is not 'implied consent,' but rather a possible result of requiring the driver to choose whether to consent under the implied consent law." (*State v. Padley* (Wis.Ct.App. 2014) 849 N.W.2d 867, 876.) "[T]he implied consent law is

18

explicitly designed to allow the driver, and not the police officer, to make the choice as to whether the driver will give or decline to give *actual* consent to a blood draw when put to the choice between consent or automatic sanctions. Framed in the terms of 'implied consent,' choosing the 'yes' option affirms the driver's implied consent and constitutes actual consent for the blood draw. Choosing the 'no' option acts to withdraw the driver's implied consent and establishes that the driver does not give actual consent." (*Id*. at p. 879.) Therefore, rather than determine whether "implied consent" to a chemical test satisfies the Fourth Amendment, we must determine whether submission to a chemical test, after advisement under the implied consent law, is freely and voluntarily given and constitutes *actual* consent.

Citing *Bumper v. North Carolina* (1968) 391 U.S. 543 (*Bumper*), defendant argues that a driver's submission to a blood draw, given only after admonition by the police pursuant to California's implied consent law, can never (or almost never) be considered valid consent under the Fourth Amendment because submission is extracted under the threat of serious consequences for refusal. True, California's implied consent law provides that "[a] person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood or breath for the purpose of determining" the alcoholic or drug content of his or her blood, if he or she is lawfully arrested for driving under the influence of alcohol or a drug. (Veh. Code, § 23612, subd. (a)(1)(A), (B).) And failure to consent to a chemical test will result in a fine, suspension of the suspect's driver's license, and other serious consequences. (Veh. Code, §§ 13353, 23612,

19

subd. (a)(1)(D).) But the categorical rule suggested by defendant has no more place in Fourth Amendment law than the per se exigency rejected by the majority in *McNeely*.

The fact that a motorist is told he will face serious consequences if he refuses to submit to a blood test does not, in itself, mean that his submission was coerced. In a related context, the United States Supreme Court in *South Dakota v. Neville* (1983) 459 U.S. 553 (*Neville*) held that use of a defendant's refusal to submit to a chemical test as evidence in a DUI trial does not violate the defendant's Fifth Amendment privilege against self-incrimination. "'[T]he Fifth Amendment is limited to prohibiting the use of "physical or moral compulsion" exerted on the person asserting the privilege.'" (*Id*. at p. 562.) "Here, the State did not directly compel respondent to refuse the test, for it gave him the choice of submitting to the test or refusing." (*Ibid*.) Although the court recognized that in extreme situations the choice given to a suspect is no choice at all, such as when the blood is extracted in a manner "so painful, dangerous, or severe, or so violative of religious beliefs, that almost inevitably a person would prefer 'confession,'" the court held that "the values behind the Fifth Amendment are not hindered when the State offers a suspect the choice of submitting to the blood-alcohol test or having his refusal used against him." (*Id*. at p. 563.)

The defendant in *Neville* conceded that "[t]he simple blood-alcohol test is so safe, painless, and commonplace . . . that the State could legitimately compel the suspect, against his will, to accede to the test." (*Neville*, *supra*, 459 U.S. at p. 563.) Therefore, because "the offer of taking a blood-alcohol test is clearly legitimate," the court concluded that "the action becomes no *less* legitimate when the State offers a second

20

option of refusing the test, with the attendant penalties for making that choice. Nor is this a case where the State has subtly coerced respondent into choosing the option it had no right to compel, rather than offering a true choice. To the contrary, the State wants respondent to choose to take the test, for the inference of intoxication arising from a positive blood-alcohol test is far stronger than that arising from a refusal to take the test." (*Id*. at pp. 563-564.) Finally, the court acknowledged that, although "the choice to submit or refuse to take a blood-alcohol test will not be an easy or pleasant one for a suspect to make," the difficultly of the decision does not mean the motorist's ultimate choice is coerced. (*Id.* at p. 564.) "[T]he criminal process often requires suspects and defendants to make difficult choices. [Citation.]" (*Ibid*.) We find it significant that, in its discussion of state implied consent laws, the *McNeely* plurality cited *Neville* with approval. (*McNeely*, *supra*, 133 S.Ct. at p. 1566 (plur. opn. of Sotomayor, J.), citing *Neville*, at pp. 554, 563-564.)

A number of sister state courts in the post-*McNeely* era have had occasion to address whether submission to a blood draw under an implied consent law may constitute valid Fourth Amendment consent and, relying on *Neville*, those courts have rejected the categorical argument advanced here by defendant. For example, in *State v. Brooks* (Minn. 2013) 838 N.W.2d 563 (*Brooks*), the defendant agreed to chemical tests under the Minnesota implied consent law after speaking to his attorney and, later, he unsuccessfully moved to suppress the results of those tests. (*Id*. at pp. 565-566.) The defendant relied on *McNeely* for the proposition that warrantless chemical tests violate the Fourth Amendment, and the State responded that the defendant voluntarily consented to

21

chemical testing.  (*Id*. at p. 567.)  Relying on *Neville* and its own authority, the Minnesota Supreme Court held that "a driver's decision to agree to take a [chemical] test is not coerced" solely because that state's implied consent law imposes criminal penalties for refusing to comply.  (*Id*. at p. 570.)  Although *Neville* and the Minnesota Supreme Court's prior case "examin[ed] the issue of coercion within the context of the Fifth Amendment privilege against self-incrimination," the *Brooks* court noted that "the question in both cases was whether the existence of a consequence for refusing to take a chemical test rendered the driver's choice involuntary," which was "the same question in the context presented here when we examine whether Brooks's consent was voluntary, as the State argues, or whether it was coerced, as Brooks argues.  [Citation.]"  (*Brooks*, at p. 570.)

The court in *Brooks* distinguished *Bumper*.  As the Minnesota Supreme Court explained, "In *Bumper*, police sought to justify their search of a house based on the owner's consent, contending that she consented to the search by saying '[G]o ahead' after police told her they had a warrant.  [Citation.]  . . .  The Court concluded that when a police officer claims authority to search a house under a warrant, 'he announces in effect that the occupant has no right to resist the search.  The situation is instinct with coercion—albeit colorably lawful coercion.  Where there is coercion there cannot be consent.'  [Citation.]"  (*Brooks*, *supra*, 838 N.W.2d at p. 571, fn. omitted.)  In contrast, the Minnesota Supreme Court noted that the state "has given those who drive on Minnesota roads a right to refuse the chemical test," and "the police are required to honor that refusal and not perform the test.  [Citation.]  Although refusing the test comes with

22

criminal penalties in Minnesota, the [United States] Supreme Court has made clear that while the choice to submit or refuse to take a chemical test 'will not be an easy or pleasant one for a suspect to make,' the criminal process 'often requires suspects and defendants to make difficult choices.'" (*Ibid.*, quoting *Neville*, *supra*, 459 U.S. at p. 564, fn. omitted.) Finally, applying the totality of the circumstances analysis, the Minnesota Supreme Court concluded that the defendant voluntarily consented to the chemical tests. (*Brooks*, at p. 572.)

Similarly, in *State v. Moore* (Or. 2013) 318 P.3d 1133 (*Moore*), the Oregon Supreme Court held that an advisory read to a motorist pursuant to the state's implied consent law does not render involuntary the motorist's submission to a chemical test. "[I]t is difficult to see why the disclosure of accurate information about a particular penalty that may be imposed—if it is permissible for the state to impose that penalty—could be unconstitutionally coercive. Rather, advising a defendant of the lawful consequences that may flow from his or her decision to engage in a certain behavior ensures that that defendant makes an informed choice whether to engage in that behavior or not. Indeed, the *failure* to disclose accurate information regarding the potential legal consequences of certain behavior would seem to be a more logical basis for a defendant to assert that his or her decision to engage in that behavior was coerced and involuntary. Of course, accurately advising a defendant of a lawful penalty that could be imposed may well play a role in the defendant's decision to engage in the particular behavior, but that does not mean that the defendant's decision was 'involuntary.'" (*Id*. at p. 1138.)

23

We agree with *Brooks* and *Moore* that a motorist's submission to a chemical test, if freely and voluntarily given, is actual consent under the Fourth Amendment.[4] That the motorist is forced to choose between submitting to the chemical test and facing serious consequences for refusing to submit, pursuant to the implied consent law, does not in itself render the motorist's submission to be coerced or otherwise invalid for purposes of the Fourth Amendment.

### 3. Defendant Freely and Voluntarily Consented to the Blood Draw

Because submission to a blood test is not coerced merely because it is made after advisement under the implied consent law, we must determine whether defendant's submission in this case was freely and voluntarily given under the normal totality of the circumstances analysis.

"To be effective, consent must be voluntary. [Citations.]" (*Ledesma*, *supra*, 43 Cal.3d at p. 234.) "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. [Citations.]" (*Florida v. Royer* (1983) 460 U.S. 491, 497.) "The voluntariness of consent is a question of fact to be determined from the totality of circumstances. [Citations.] If the validity of a consent is challenged, the prosecution

---

[4] (Accord, *McCoy v. North Dakota Dept. of Trans.* (N.D. 2014) 848 N.W.2d 659, 667-668 ["a driver's decision to agree to take a [chemical] test is not coerced simply because an administrative penalty has been attached to refusing the test"; finding driver's consent was freely and voluntarily given under the totality of the circumstances].)

24

must prove it was freely and voluntarily given—i.e., 'that it was [not] coerced by threats or force, or granted only in submission to a claim of lawful authority.' [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 445-446.)

"'The . . . voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, "The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence."'" (*People v. Monterroso* (2004) 34 Cal.4th 743, 758, quoting *People v. James* (1977) 19 Cal.3d 99, 107.)

After arresting defendant on suspicion of driving under the influence of a drug, Deputy Robinson told defendant that he did not have the right to talk to a lawyer when deciding whether to submit to a chemical test, that his driver's license would be suspended if he refused to submit to a chemical test, and that his refusal could be used against him in court. Deputy Robinson testified that defendant responded, "okay," and that at no time did defendant appear unwilling to provide a blood sample. Deputy Robinson also testified that he observed a phlebotomist draw defendant's blood, and that defendant did not resist or say, "no, I don't want to do this." At the suppression hearing, defendant was not asked whether he responded "okay" to Deputy Robinson's admonition under the implied consent law. At most, he testified that Deputy Robinson was not present during the blood draw, and that the blood draw was performed while defendant was inside a holding cell with his hands handcuffed behind his back to a chair.

25

Moreover, defendant did not testify that he told the phlebotomist that he did not want to give a blood sample or that he otherwise resisted.

The undisputed evidence in the record demonstrates that defendant verbally agreed to a blood test after being admonished by Deputy Robinson under the implied consent law, and that he did not verbally refuse to give a blood sample or demonstrate a desire to withdraw his consent either verbally or by physically resisting the phlebotomist's attempt to draw his blood. Although defendant testified that his hands were handcuffed behind his back to a chair when his blood was drawn, which might indicate that defendant's submission to the blood test was not freely and voluntarily given, the trial court implicitly found that defendant's testimony was not credible. "'As the finder of fact . . . the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable.' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 979 (*Tully*).) "Moreover, the reviewing court 'must accept the trial court's resolution of disputed facts and its assessment of credibility.' [Citation.]" (*Ibid.*) Therefore, we must accept the trial court's implied findings and also conclude that defendant's testimony was not credible.

In the brief defendant filed in the superior court appellate division, which he incorporates by reference into his supplemental brief filed in this court, defendant argued that Deputy Robinson's admonition under the implied consent law was false, and that valid Fourth Amendment consent may not be obtained if the police lie about the implied consent law. Deputy Robinson admonished that because he concluded defendant was

26

under the influence of a drug, defendant was required to submit to a chemical test, and that a blood test was "the only option" available.  Defendant argues this was false because when a motorist is arrested on suspicion of driving under the combined influence of alcohol and a drug, he must be given the choice between a blood or breath test and may only be compelled to take a blood test "if the officer has a clear indication that a blood test will reveal evidence of the person being under the influence."  (Veh. Code, § 23612, subd. (a)(2)(B), (C).)  Deputy Robinson also told defendant that, if he refused to submit to a blood test, his license would be suspended "for the next two to three years."  Again, defendant contends this was false because refusing to submit to a chemical test results in a one-year suspension for a first-time DUI offense.  (Veh. Code, § 23612, subd. (a)(1)(D).)

In *Moore*, *supra*, 318 P.3d 1133, the Oregon Supreme Court recognized that, while accurate advisement of the consequences under an implied consent law of refusing to submit to chemical testing does not mean that submission to a chemical test is coerced, "*failure* to disclose accurate information regarding the potential legal consequences of certain behavior would seem to be a more logical basis for a defendant to assert that his or her decision to engage in that behavior was coerced and involuntary."  (*Id.* at p. 1138.)  There, the officer's admonition to the motorist differed from the Oregon implied consent law in several respects, yet the Oregon Supreme Court concluded that the officer's admonition accurately advised the motorist about the consequences of refusing to submit to a blood test and did not result in a coerced submission to a chemical test.  (*Id.* at pp. 1139-1140.)

27

The same is true here. There is nothing in the record to support defendant's suggestion that Deputy Robinson intentionally deceived him about the contours of the implied consent law. Moreover, Deputy Robinson's admonition, though not entirely accurate, was not patently false and it did sufficiently inform defendant that because the deputy suspected defendant of driving under the influence of a drug, and not under the influence of alcohol or a combination of alcohol and a drug, defendant was required under the implied consent law to submit to a blood test. Finally, although Deputy Robinson inaccurately advised defendant that refusing to submit to a blood test would automatically result in a two- or three-year license suspension, he correctly informed defendant that his license would in fact be suspended if he refused to submit to a blood test. As the appellate division recognized in its opinion, failure to strictly follow the implied consent law does not violate a defendant's constitutional rights. (*Harris*, *supra*, 225 Cal.App.4th at p. Supp. 10, fn. 3, quoting *Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107, 118.)

Under the totality of the circumstances, we conclude that defendant freely and voluntarily consented to his blood being drawn, and that he was not coerced or tricked into submitting to the blood test.

### 4. The Blood Draw Was Conducted in a Reasonable Manner

Finally, defendant contends his blood draw was not conducted in a reasonable manner. According to defendant, the United States Supreme Court has held that, for a blood draw to be reasonably performed under the Fourth Amendment, it must be performed in a hospital or medical environment by medical personnel utilizing "accepted

28

medical practices." He argues that, because his blood was drawn at a police station and the record does not contain substantial evidence that it was performed by a medical professional using accepted medical practices, his blood draw was not reasonably performed. We conclude otherwise.

In *Schmerber*, the United States Supreme Court held that "compulsory administration of a blood test . . . plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment." (*Schmerber*, *supra*, 384 U.S. at p. 767.) Because "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner," one question before the court was "whether the means and procedures employed in taking [the defendant's] blood respected relevant Fourth Amendment standards of reasonableness." (*Id*. at p. 768.)

The defendant in *Schmerber* was transported to a hospital because of the injuries he sustained in a car accident and, "[a]t the direction of a police officer, a blood sample was . . . withdrawn from petitioner's body by a physician at the hospital." (*Schmerber*, *supra*, 384 U.S. at p. 758.) The court had previously observed that drawing blood with a hypodermic needle was commonplace. "The blood test procedure has become routine in our everyday life. It is a ritual for those going into the military service as well as those applying for marriage licenses. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors." (*Breithaupt v. Abram* (1957) 352 U.S. 432, 436.) The *Schmerber* court reiterated that observation. "[W]e are satisfied that the test

29

chosen to measure petitioner's blood-alcohol level was a reasonable one.  Extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol.  [Citation.]  Such tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." (*Schmerber*, at p. 771, fn. omitted; see *id*. at p. 771, fn. 13 ["'The blood test procedure has become routine in our everyday life'"].)

Finally, the court concluded "the record shows that the test was performed in a reasonable manner.  Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices." (*Schmerber*, *supra*, 384 U.S. at p. 771.)  But the court did not decide whether blood draws were only reasonable when performed in a hospital.  "We are . . . not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse.  To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain." (*Id*. pp. 771-772.)

In *McNeely*, the defendant was transported to a hospital when he refused to submit to a breath test. (*McNeely*, *supra*, 133 S.Ct. at p. 1557.)  At the direction of the police officer, a hospital lab technician drew the defendant's blood. (*Ibid*.)  The sole issue in that case was whether the natural dissipation of alcohol in the bloodstream was sufficient, in itself, to justify a warrantless blood draw. (*Id*. at p. 1558.)  The court did not decide

30

whether McNeely's blood draw was performed in a reasonable manner, and it merely reiterated what it said in *Schmerber*. (*McNeely*, at p. 1560.) However, it bears noting that, while the majority in *McNeely* recognized that "a police officer must *typically* transport a drunk-driving suspect to a medical facility and obtain the assistance of someone with appropriate medical training before conducting a blood test," the court did not hold that the police *must always* transport the suspect to a hospital or medical facility. (*Id.* at p. 1561, italics added.)

Defendant cites no decision that interpreted *Schmerber* (or *McNeely*) as mandating that blood draws must always take place in a hospital or medical facility and that the People must always establish that the person who conducted the blood draw was properly licensed. In fact, the appellate courts of this state have uniformly "concluded that a blood test was not unconstitutional even though the person drawing the blood may not have been authorized to perform the extraction under applicable statutory provisions and even though the blood was drawn at a jail rather than at a medical facility. (See *People v. Ford* (1992) 4 Cal.App.4th 32, 34–37 [5 Cal.Rptr.2d 189] [(*Ford*)] [blood draw conducted at police station]; see also *People v. Esayian* (2003) 112 Cal.App.4th 1031, 1035, 1037–1041 [5 Cal.Rptr.3d 542] [(*Esayian*)] [drawing of arrestee's blood by phlebotomist who was not fully qualified to draw blood under state law for purposes of determining its alcoholic content did not violate 4th Amend.]; *People v. McHugh* (2004) 119 Cal.App.4th 202, 213–214 [14 Cal.Rptr.3d 142] [same]; *People v. Mateljan* (2005) 129 Cal.App.4th 367, 376 [28 Cal.Rptr.3d 506] [(*Mateljan*)] [same].)" (*People v. Cuevas* (2013) 218 Cal.App.4th 1278, 1284 (*Cuevas*).)

31

Rather than apply categorical rules to blood draws conducted outside of a hospital or medical facility, California courts "emphasize the key inquiry is whether 'the manner in which the sample was obtained deviated so far from the medical practices found to be reasonable in *Schmerber* as to render the seizure constitutionally impermissible.' ([*Ford*], *supra*, 4 Cal.App.4th at p. 37; see [*Esayian*], *supra*, 112 Cal.App.4th at p. 1040 [noting that whereas the high court in *Schmerber* 'express[ed] some doubts about blood being drawn in the private setting of the police station, it did not attempt to set any specific rules for blood tests conducted outside the hospital setting'].) Under this standard, the court considers the overall reasonableness of the blood draw to determine whether 'the test conditions subjected [the arrestee] to "an unjustified element of personal risk of infection or pain."' ([*Ford*], at p. 38; see [*Mateljan*], *supra*, 129 Cal.App.4th at p. 376 [court evaluates whether 'draws were performed in a manner which . . . create[d] undue harm or risk . . .']; *People v. Sugarman* (2002) 96 Cal.App.4th 210, 216 [116 Cal.Rptr.2d 689] (*Sugarman*) [court inquires whether defendant was exposed 'to an unreasonable risk of infection or pain']; [*Esayian*], at p. 1041 [stating 'nothing in this record . . . justif[ied] an inference that the manner of drawing the blood was unsanitary, or subjected the suspect to any unusual pain or indignity'].)" (*Cuevas*, *supra*, 218 Cal.App.4th at pp. 1284-1285.)

Based on this well-settled law, we reject defendant's assertion that his blood test was unreasonable merely because it was conducted in a police station instead of in a

hospital or medical facility.[5]  There is no evidence in the record to suggest that the fact defendant's blood was drawn in a police station, by itself, increased the danger that he would suffer unreasonable pain or risk of infection.  (See *Ford*, *supra*, 4 Cal.App.4th at p. 38 ["nothing in this record suggests that the location in which this test occurred was unsafe or unsanitary or that the personnel present would fail to respond properly in the unlikely event of a medical problem resulting from the test"].)

Moreover, we reject the suggestion in defendant's supplemental brief that the blood draw was unreasonable because he was handcuffed to a chair and that Deputy Robinson could not have truthfully testified about how the blood draw was conducted because he was in another room and did not actually witness the blood draw.  As already noted, *ante*, the trial court made an implied determination that Deputy Robinson was a credible witness, and that defendant was not credible.  We may not disturb that implied credibility finding.  (*Tully*, *supra*, 54 Cal.4th at p. 979.)  Consequently, we do not credit defendant's testimony that his hands were handcuffed behind his back to a chair when the

---

[5]  A number of sister state courts have also concluded that *Schmerber* does not mandate that blood testing be conducted in a hospital or medical facility.  (See, e.g., *State v. Boehm* (N.D. 2014) 849 N.W.2d 239, 247 ["A blood test is not per se unreasonable because it was done at a jail, rather than a hospital, when conducted by a medically qualified person"]; *State v. Johnston* (Tex.Crim.App. 2011) 336 S.W.3d 649, 662 ["we are not convinced that *Schmerber*'s reasonable manner requirement acts as a per se bar to blood draws conducted in a non-medical environment.  Though a medical environment may be ideal, it does not mean that other settings are unreasonable under the Fourth Amendment"]; *State v. May* (Ariz.Ct.App. 2005) 112 P.3d 39, 41 [relying on, inter alia, *Esayian* for the proposition that *Schmerber* did not categorically rule out blood tests conducted outside of a medical setting].)

phlebotomist drew his blood, and that Deputy Robinson was not in the room and did not witness the blood draw.

Deputy Robinson testified that when defendant was transported to the Moreno Valley sheriff's station, "AFN Coughlin" responded to a call for a blood nurse. Deputy Robinson testified that AFN Coughlin was a phlebotomist with whom he had previously worked, and that he watched her draw defendant's blood. Deputy Robinson saw the phlebotomist swab the inside of defendant's right elbow with what appeared to be disinfectant. The phlebotomist then used what appeared to be a normal, dry hypodermic syringe, and glass vials with rubber tops that slipped onto the syringe, to take a sample of defendant's blood. Deputy Robinson testified that defendant did not resist the attempt to take his blood sample or otherwise express his unwillingness to give a sample. The phlebotomist then packaged the blood sample, and Deputy Robinson deposited it in a blood depository at the station. Other than testify that Deputy Robinson was not present during the blood draw, and that defendant's hands were handcuffed behind his back to a chair, defendant did not testify about how the blood draw was administered and did not testify that he experienced any pain or discomfort during or after the blood draw.

Although the testimony about defendant's blood draw was somewhat sparse, we agree with the appellate division that the method used to extract his blood sample was reasonable under the Fourth Amendment. The decision in *Cuevas* is instructive. There, the defendants were transported to a jail facility or, in one case, to a hospital where the defendants' blood samples were taken "either [by] phlebotomists, blood technicians, or individuals who routinely draw blood." (*Cuevas*, *supra*, 218 Cal.App.4th at p. 1282.)

34

The arresting officers testified that they "observed that the individual drawing blood cleaned the area before drawing blood and used a needle from a sealed package." (*Ibid*.) There was no evidence that either of the defendants experienced pain or discomfort from the blood draw. (*Ibid*.) Finally, the officers testified that they observed the person who drew the blood bandage the injection area after taking the sample. (*Ibid*.)

With respect to the person who drew the blood, "in each case the officer testified the blood draw was performed by a person the officer believed to be a trained phlebotomist or blood technician. These beliefs were supported either by the officer's prior contacts with that person in the context of prior arrestee blood draws, by the procedure employed by the officer to cause that person to respond to the jail to perform the blood draw, or . . . by the officer's account that the person responded to his request for a phlebotomist at the hospital." (*Cuevas*, *supra*, 218 Cal.App.4th at p. 1286.) The court concluded the evidence established the defendants' blood was drawn in a reasonable manner. "[T]he officers' testimony confirmed that none of the defendants exhibited any signs of pain or discomfort during the blood draw procedure; indeed, the testimony reflects these were routine blood draws consistent either with the officer's own experience of having blood drawn or with the officer's observation of other arrestee blood draws. Moreover, the testimony reflects the blood draws were conducted in a cooperative manner, utilizing needles from sealed packages and ensuring the blood extraction area was cleaned prior to inserting the needle and cleaned and bandaged after the blood was drawn." (*Ibid*.) Viewing the totality of the circumstances, the court concluded "the officer's unrebutted testimony shows the blood draw did not expose the

35

defendant to "'"an unjustified element of personal risk of infection or pain"'" [citations], and was not performed in a manner which created any 'undue harm or risk' to defendant [citation]. In sum, we are persuaded the blood draws in these cases were conducted in a constitutionally reasonable manner." (*Ibid*.)

So too here. Deputy Robinson testified that defendant's blood was drawn by a trained phlebotomist, which was substantiated by his prior experience with her and by the fact that she responded to the call for a blood nurse. (*Cuevas*, *supra*, 218 Cal.App.4th at p. 1286.) That the People introduced no testimony about the phlebotomist's qualifications or certification under state law is irrelevant for purposes of determining whether defendant's blood was drawn in a constitutionally reasonable manner. (*Mateljan*, *supra*, 129 Cal.App.4th at pp. 373-374.) Furthermore, Deputy Robinson's testimony about how the phlebotomist went about drawing defendant's blood, while by no means comprehensive, established that the phlebotomist followed routine procedures for safely and effectively drawing blood. (*Cuevas*, at pp. 1282, 1286.) Finally, Deputy Robinson testified that defendant did not resist the phlebotomist's attempt to draw his blood, and neither Deputy Robinson nor defendant testified that defendant experienced any pain or discomfort. (*Id*. at p. 1286.) Under the totality of the circumstances, we conclude defendant's blood was drawn in a reasonable manner that conformed to the dictates of the Fourth Amendment.

5. Conclusion

In sum, we conclude that defendant's blood draw was reasonable under the Fourth Amendment because actual consent to a chemical test is a valid exception to the warrant

36

requirement, and because defendant freely and voluntarily submitted to the chemical test. We also conclude that defendant's blood draw was performed in a reasonable manner that comports to the Fourth Amendment. Therefore, we conclude the trial court correctly denied defendant's motion to suppress.

     C.    *Even If Consent to a Blood Draw Does Not Satisfy the Fourth Amendment, the Good Faith Exception to the Exclusionary Rule Applies*

Even if we were to conclude that a warrantless blood draw may not be justified under the consent exception to the warrant requirement, and that a warrantless blood draw is *only* justified under the exigent circumstances doctrine, we would still affirm the trial court by applying the good faith exception to the exclusionary rule. First, we reject the assertion by amici curiae that the United States Supreme Court has already ruled that the good faith exception does not apply to blood draws taken before *McNeely* was decided. Last, we conclude that, at the time of defendant's blood draw, it was well settled in California that the natural dissipation of alcohol or drugs in the bloodstream was a sufficient exigency to support a warrantless blood draw. Therefore, penalizing the police for reasonably acting pursuant to binding pre-*McNeely* law will not advance the purpose of the exclusionary rule by deterring future Fourth Amendment violations.

As an initial matter, we disagree with the appellate division that the People did not preserve for appeal the assertion of the good faith exception. (*Harris*, *supra*, 225 Cal.App.4th at p. Supp. 6, fn. 2.) The People clearly articulated application of the good faith exception in the written opposition to defendant's motion to suppress. Unsurprisingly, the People did not argue application of the good faith exception at the

hearing on the motion because the trial court denied the motion after hearing solely from defendant's attorney and before the prosecutor had an opportunity to argue. With that victory in hand, the prosecutor had no reason to argue application of the good faith exception. Finally, the People argued in their brief in the appellate division, albeit in a short footnote, that the good faith exception applies. Therefore, we conclude the People sufficiently preserved the good faith exception argument for appeal.

       1.  <u>The United States Supreme Court Has Not Decided Whether the Good Faith Exception to the Exclusionary Rule Applies to Pre-*McNeely* Blood Draws</u>

Citing *Aviles v. Texas* (2014) ___ U.S. ___ [134 S.Ct. 902], amicus curiae CDLA argues that the United States Supreme Court has already decided that the good faith exception to the exclusionary rule is inapplicable to warrantless blood draws taken before *McNeely*. We disagree.

In *Aviles v. State* (Tex. App. 2012) 385 S.W.3d 110, the Texas Court of Appeals held that a warrantless, nonconsensual blood draw did not violate the Fourth Amendment, and the court affirmed denial of a motion to suppress. (*Id*. at pp. 115-116.) The court had no occasion to decide whether the good faith exception to the exclusionary rule should apply. Nine months after it decided *McNeely*, the United States Supreme Court granted a petition for writ of certiorari filed by Aviles, vacated the judgment, and remanded the case to the Texas Court of Appeals "for further consideration in light of [*McNeely*]." (*Aviles v. Texas*, *supra*, 134 S.Ct. 902.) On remand, the Texas Court of Appeals held that the blood draw violated the Fourth Amendment, and the court reversed denial of the suppression motion. (*Aviles v. State* (Tex. App. 2014) 443 S.W.3d 291.)

38

Again, the Texas Court of Appeals did not address the good faith exception to the exclusionary rule.

Contrary to the suggestion from CDLA, the United States Supreme Court's order in *Aviles v. Texas*, *supra*, 134 S.Ct. 902, did not decide—implicitly or otherwise—whether the good faith exception applies to warrantless blood draws conducted before *McNeely*. In fact, the United States Supreme Court made no ruling whatsoever on the merits. Orders such as the one in *Aviles v. Texas*, "colloquially termed 'GVRs,' meaning 'granted, vacated, and remanded,' do not resolve a case. [Citation.]" (*Vazquez-Valentin v. Santiago-Diaz* (1st Cir. 2006) 459 F.3d 144, 147-148.) A GVR order is "not a 'final determination on the merits.' [Citation.] It simply indicat[es] that, in light of 'intervening developments,' there [is] a 'reasonable probability' that the [lower court] [will] reject a legal premise on which it relied and which may affect the outcome of the litigation. [Citation.]" (*Tyler v. Cain* (2001) 533 U.S. 656, 666, fn. 6.) "When the Supreme Court grants a GVR, the lower court to which the case is remanded 'is free to determine whether its original decision is still correct in light of the changed circumstances or whether a different result is more appropriate.' [Citation.]" (*Diaz v. Stephens* (5th Cir. 2013) 731 F.3d 370, 378.) In other words, "[i]n issuing a GVR, the Court does not determine that the intervening event necessarily changes the outcome in

39

the case, just that it might."**6** (Bruhl, *The Supreme Court's Controversial GVRs—And an Alternative* (2009) 107 Mich. L.Rev. 711, 712.)

Nor did the GVR in *Aviles v. Texas*, *supra*, 134 S.Ct. 902, mandate the result in *Weems v. State* (Tex. App. 2014) 434 S.W.3d 655 (*Weems*), as suggested by CDLA. In that case, the Texas Court of Appeals held that blood drawn in violation of the Fourth Amendment, as interpreted by *McNeely*, had to be suppressed *under Texas law* because "there is no such good faith exception found in Texas's exclusionary rule—and Texas can provide more protection to a suspect than federal law." (*Weems*, at p. 666.) In any event, *Weems* has no application here. Unlike Texas, in California, suppression of evidence and the good faith exception to the exclusionary rule are interpreted under federal constitutional standards. (Cal. Const., art. I, § 28, subd. (f)(2); *People v. Schmitz* (2012) 55 Cal.4th 909, 916; *People v. Willis* (2002) 28 Cal.4th 22, 29-30.)

---

**6** Some state courts have treated the GVR in *Aviles v. Texas*, *supra*, 134 S.Ct. 902, as authoritative precedent. For example, the Nevada Supreme Court recently held that, although the GVR in *Aviles v. Texas* "appears to hold limited precedential value on its own," it undermined the state's argument in that case that a motorist's consent to a blood draw satisfied the Fourth Amendment. (*Byars v. State* (Nev. Oct. 16, 2014) 336 P.3d 939, 946.) For the reasons stated in the text, we respectfully disagree with the Nevada Supreme Court and decline to give the GVR in *Aviles v. Texas* more weight than the United States Supreme Court itself assigns to GVRs. (Accord, *State v. Won* (Hawai'i Ct. App. 2014) 332 P.3d 661, 682, fn. 28 ["*Won* reads the Supreme Court's action in *Aviles* as indicating that there is no 'implied consent' exception to the warrant requirement. However, absent a more definitive statement by the United States Supreme Court, we decline to read the Court's action in *Aviles* as a decision addressing the merits of implied consent statutes or the issues presented in Won's case"].)

## 2. The Good Faith Exception Applies to Warrantless Blood Draws Conducted Under Well-Settled and Binding California Precedent Predating *McNeely*

"The [Fourth] Amendment says nothing about suppressing evidence obtained in violation of [its] command. That rule—the exclusionary rule—is a 'prudential' doctrine, [citation], created by this Court to 'compel respect for the constitutional guaranty.' [Citations.] Exclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search. [Citations.] The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations. [Citations.] Our cases have thus limited the rule's operation to situations in which this purpose is 'thought most efficaciously served.' [Citation.] Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.' [Citation.]" (*Davis v. United States* (2011) 564 U.S. ___ [131 S.Ct. 2419, 2426-2427] (*Davis*).)

The high court has held that the decision whether to suppress evidence obtained in violation of the Fourth Amendment "must also account for the 'substantial social costs' generated by the rule," because "[e]xclusion exacts a heavy toll on both the judicial system and society at large. [Citation.]" (*Davis*, *supra*, 131 S.Ct. at p. 2427.) "Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.' [Citation.] For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs. [Citations.]" (*Ibid.*) In a series of cases starting with *United States v. Leon* (1984) 468 U.S. 897 (*Leon*), the United States Supreme Court concluded "that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue. [Citation.] When the police exhibit 'deliberate,'

41

'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. [Citation.] But when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, [citation], or when their conduct involves only simple, 'isolated' negligence, [citation], the '"deterrence rationale loses much of its force,"' and exclusion cannot 'pay its way.' [Citation.]" (*Davis*, at pp. 2427-2428.)

In *Davis*, the police searched the passenger compartment of a vehicle incident to the arrest of the driver and the defendant, who was a passenger, and found a revolver in the defendant's jacket pocket. (*Davis*, *supra*, 131 S.Ct. at p. 2425.) At the time of the search, binding precedent from the United States Court of Appeals for the Eleventh Circuit interpreted *New York v. Belton* (1981) 453 U.S. 454 (*Belton*) as establishing a bright-line rule permitting automobile searches incident to the arrest of a recent occupant regardless of whether the occupant was within reaching distance of the vehicle. (*Davis*, at p. 2426.) While the defendants' appeal from the denial of his suppression motion was pending before the Eleventh Circuit, the United States Supreme Court held in *Arizona v. Gant* (2009) 556 U.S. 332 (*Gant*) that *Belton* did not create a bright-line rule permitting automobile searches, and the court instead held that an automobile search may only be conducted incident to the arrest of a recent occupant if (1) the arrestee is within reaching distance of the vehicle during the search, or (2) the police have reason to believe that evidence relevant to the crime of arrest will be found inside the vehicle. (*Davis*, at pp. 2425-2426.) The Eleventh Circuit subsequently ruled that the search in the *Davis*

case was unlawful under *Gant*, but applied the good faith exception to the exclusionary rule and declined to suppress the revolver. (*Davis*, at p. 2426.)

The United States Supreme Court held "that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." (*Davis*, *supra*, 131 S.Ct. at pp. 2423-2424; see *id*. at p. 2434.) The search in that case was conducted before the Supreme Court decided *Gant* and, although the search turned out to be unconstitutional, the police "followed the Eleventh Circuit's . . . precedent to the letter" and acted "in strict compliance with then-binding Circuit law and [were] not culpable in any way. [Citation.]" (*Davis*, at p. 2428.) "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.' [Citation.] The conduct of the officers here was neither of these things." (*Ibid*.) Nor did the high court conclude that the officers "violat[ed] Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence," or that the "case involv[ed] any 'recurring or systemic negligence' on the part of law enforcement. [Citation.]" (*Ibid*.)

The high court also noted that "in 27 years of practice under *Leon's* good-faith exception, we have 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct. [Citation.]" (*Davis*, *supra*, 131 S.Ct. at p. 2429.) Therefore, penalizing the officers in that case for following the Eleventh Circuit's error would not logically deter future Fourth Amendment violations. (*Ibid*.) "About all that exclusion would deter in this case is conscientious police work. . . . An officer who conducts a search in reliance on binding appellate precedent does no more

43

than "'ac[t] as a reasonable officer would and should act'" under the circumstances. [Citation.]" (*Id*. at p. 2429.)

The same is true here. As the appellate division correctly stated, "California cases uniformly interpreted *Schmerber* to mean that no exigency beyond the natural evanescence of intoxicants in the bloodstream, present in every DUI case, was needed to establish an exception to the warrant requirement. [Citations.]" (*Harris*, *supra*, 225 Cal.App.4th at p. Supp. 5.) Our Supreme Court first addressed *Schmerber* in *People v. Superior Court* (*Hawkins*) (1972) 6 Cal.3d 757 (*Hawkins*): "It is clear that the Fourth Amendment does not bar a compulsory seizure, without a warrant, of a person's blood for the purposes of a blood alcohol test to determine intoxication, provided that the taking of the sample is done in a medically approved manner, is incident to a lawful arrest, and is based upon the reasonable belief that the person is intoxicated." (*Id*. at p. 761, citing *Schmerber*, *supra*, 384 U.S. at pp. 766-772.) "*Schmerber* recognizes that once the suspect is arrested, a seizure incident thereto may be properly conducted without a warrant, since the rapid dissipation of the alcohol would make the delay involved in obtaining a search warrant unnecessary and unjustifiable." (*Hawkins*, at p. 765, fn. 7.)

After *Hawkins*, our Supreme Court and this state's intermediate appellate courts uniformly reiterated that a warrantless blood draw was justified under the Fourth Amendment if "the arresting officer has reasonable cause to believe the arrestee is intoxicated" with alcohol (*Mercer v. Department of Motor Vehicles* (1991) 53 Cal.3d 753, 757), and those courts did not require any additional showing of exigency to excuse the lack of a warrant. (See, e.g., *Sugarman*, *supra*, 96 Cal.App.4th at p. 214; *Ford*, *supra*,

44

4 Cal.App.4th at p. 35; see generally cases cited in *Harris*, *supra*, 225 Cal.App.4th at p. Supp. 5.)

In *People v. Ritchie* (1982) 130 Cal.App.3d 455 [Fourth Dist., Div. Two], this court extended that rule to drivers arrested on suspicion of driving under the influence of a drug. We rejected the trial court's conclusion that, for purposes of warrantless blood draw, "a distinction exists between the ingestion of alcohol and the ingestion of drugs. We detect no appreciable difference. It is a matter of common knowledge that from the moment of ingestion the body begins to eliminate drugs from the system. While the rate of dissipation may depend on many factors, one, of course, being the type of drug involved, nevertheless, the amount of drug in the blood stream does diminish with the passage of time." (*Id*. at p. 458, fn. omitted.) "We can find no basis for a requirement that law enforcement officials ascertain the nature of the drug ingested in order to determine just how fast it will dissipate. A contrary rule would necessitate that in cases such as this not only would the officer have to identify the drug but some expert testimony would have to be presented as to the rate of dissipation of that particular drug. This appears to be completely unreasonable and places an unnecessary burden on the prosecution." (*Id*. at p. 459.)

As the appellate division recognized, *McNeely* "repudiated the long-standing California interpretation of *Schmerber*." (*Harris*, *supra*, 225 Cal.App.4th at p. Supp. 6.) After *McNeely*, it is now clearly established that the natural dissipation of alcohol or drugs in the bloodstream is not a sufficient exigency to justify a warrantless blood draw, and the People must show, on a case-by-case basis, that under the totality of the circumstances exigent circumstances excused the failure to obtain a search warrant. (*McNeely*, *supra*, 133 S.Ct. at pp. 1563, 1568.) However, the police in this case conducted a warrantless blood draw in good faith reliance of then-binding California authority which held that no additional exigent circumstances were required. The record contains no evidence that Deputy Robinson acted "deliberately, recklessly, or with gross negligence," or that this "case involv[ed] any 'recurring or systemic negligence' on the part of law enforcement" (*Davis*, *supra*, 131 S.Ct. at p. 2428) to act in contravention of binding law mandating additional exigent circumstances before performing a warrantless search. The police were in no way culpable for following the law of this state that had been settled for just over 40 years. To penalize the police in this case for the courts' error, which was only brought to light *after* defendant's blood draw, would not logically serve to deter future Fourth Amendment violations. (*Davis*, at p. 2429.) Therefore, because Deputy Robinson acted "in objectively reasonable reliance on binding appellate

46

precedent" interpreting *Schmerber*, the search here is not subject to the exclusionary rule.[7] (*Davis*, at pp. 2423-2424.)

Defendant contends the good faith exception to the exclusionary rule cannot be applied here because Deputy Robinson was not acting in objectively reasonable reliance of binding precedent. According to defendant, the relevant binding precedent in this case was *Schmerber*, which, he contends, always required something more than the natural dissipation of alcohol or drugs in the bloodstream to justify a warrantless search. He argues "there can never be reasonable reliance on State law that clearly disregards United States Supreme Court opinions regarding federal constitutional matters . . . ."

Defendant's argument is based on the assumption that, even before *McNeely*, *Schmerber* was universally recognized as requiring an additional showing of exigent circumstances on a case-by-case basis that a warrant could not be timely obtained and that the mere dissipation of alcohol or drugs in the bloodstream did not establish a per se exigency. Not so. In *McNeely*, the majority concluded that *Schmerber* had not set forth a

---

**7** Our colleagues in three other Courts of Appeal have similarly concluded that warrantless blood draws conducted in the pre-*McNeely* era were subject to the good faith exception to the exclusionary rule because the officers reasonably relied on binding California precedent permitting such tests without an additional showing of exigency. (*People v. Youn* (2014) 229 Cal.App.4th 571, 579; *People v. Rossetti* (2014) 230 Cal.App.4th 1070, 1076-1077; *People v. Jones* (2014) 231 Cal.App.4th 1257, 1263-1265.)

Courts from other jurisdictions have also applied the good faith exception as applied in *Davis* and concluded that evidence obtained through pre-*McNeely* warrantless blood draws could not be suppressed. (See, e.g., *State v. Edwards* (S.D. 2014) 853 N.W.2d 246, 252-254; *State v. Reese* (Wis.Ct.App. 2014) 844 N.W.2d 396, 401-403 [applying state law precedent based on *Leon* and its progeny]; *United States v. Lechliter* (D. Md. 2014) 3 F.Supp.3d 400, 406-409.)

per se exigency based on the natural dissipation of alcohol in the bloodstream and, instead, held that the totality of the circumstances established exigent circumstances for the warrantless blood draw in that case. (*McNeely*, *supra*, 133 S.Ct. at pp. 1559-1560.) But that was *not* the universally accepted interpretation of *Schmerber* before *McNeely*, and the high court granted certiorari in *McNeely* for the express purposes of resolving a split in authority on that very question. (*McNeely*, at p. 1558 & fn. 2.)

### 3. Conclusion

In sum, we conclude that the United States Supreme Court has not yet addressed whether the good faith exception to the exclusionary rule applies to warrantless blood draws taken before *McNeely*. Further, such blood draws conducted in good faith reliance of binding California precedent, which permitted warrantless blood draws based solely on a showing of probable cause of intoxication and the natural dissipation of alcohol or drugs in the bloodstream, are subject to the good faith exception. Because Deputy Robinson acted in objectively reasonable reliance on binding California precedent when he conducted defendant's warrantless blood draw, we conclude this case is not governed by the exclusionary rule.

## IV.

## DISPOSITION

The order denying defendant's motion to suppress is affirmed.

CERTIFIED FOR PUBLICATION

McKINSTER

Acting P. J.

We concur:


MILLER

J.


CODRINGTON

J.