Filed 7/25/24 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. HAADI BOLOURCHI, Defendant and Appellant. | A167289 (Marin County Super. Ct. No. SC207297A) ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

BY THE COURT\*:

The court orders that the opinion filed in this appeal on June 28, 2024, be modified as follows:

1. On page 12, delete the second sentence in footnote 5:

> After the officer arrested him, the record only shows the officer asked him to take a blood test, even though arguably he should have offered the alternative of a post-arrest breath test (§ 23612, subd. (a)(2)(B)) before asking for a blood test if Bolourchi chose breath testing.

Insert in place of the deleted sentence indicated above, continuing within the same paragraph, the following substitute language:

---

\* Brown, P. J., Streeter, J., Hite, J. (Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.)

After Bolourchi's arrest, the record only shows Officer Finerty asking him to take a blood test, even though an arrestee in those circumstances should be given the alternative of a post-arrest breath test (§ 23612, subd. (a)(2)(B)) before a blood test is requested if the choice is breath testing.

2. On page 13, at the end of the first paragraph in part II.B, change the last sentence to end at ". . . United States Supreme Court," delete the word "that" and add the language "These cases" to start a new sentence, so that it reads:

> To evaluate this contention, we begin with a background discussion of a series of Fourth Amendment cases from the United States Supreme Court. These cases, together, enunciate the applicable law.

3. On page 14, in the first sentence of the first full paragraph, insert the word "governing" before "law," delete the phrase "of this state," insert the phrase "as we read it in California" after the word "decades," and delete the word "California" before the word "courts," so the sentence reads:

> There the governing law stood for decades as we read it in California, with courts uniformly holding the Fourth Amendment permits unconsented, warrantless blood draws in DUI investigations under the exigent circumstances exception recognized in *Schmerber*.

4. On page 14, in the last sentence of the second full paragraph, add the word "her" in place of the word "the" before "opinion," and add the phrase "in *McNeely*" after "opinion," so the sentence reads:

> In addition, while Justice Sotomayor's opinion for the five justice *McNeely* majority rejects the idea of per se exigency, she failed to garner a fifth vote for section III of her opinion in *McNeely* discussing an issue relevant to this case—the power of the states to use implied consent laws to enforce their DUI laws consonant with the Fourth Amendment.

5. On page 17, at the end of the paragraph that begins on page 16 and that currently ends with the citation "(*Birchfield,* at pp. 476–477.)" add

2

the following sentence after that citation, so the new concluding sentence of the paragraph reads:

> Thus, recognizing that blood draws are more invasive of a defendant's privacy and personal dignity (*id*. at pp. 461–464), the court drew a sharp distinction between blood and breath tests.

6. On page 17, in the first full paragraph, delete the first sentence, which reads:

> The Supreme Court then applied these legal conclusions to the three cases before it.

Insert in place of the deleted sentence indicated above the following substitute language:

> This distinction is evident in the court's analysis and disposition of each of the three cases presented.

7. On page 18, in the last paragraph, in the sentence that begins "When the *Mitchell* and *McNeely* pluralities . . ." add the parenthetical "(Roberts, C. J., Alito, J., and Kavanaugh, J., in the *Mitchell* plurality; and Sotomayor, J., and Kagan, J., in the *McNeely* plurality)" after ". . . United States Supreme Court" so the sentence reads:

> When the *Mitchell* and *McNeely* pluralities and the *Birchfield* majority opinion are read together, five current justices on the United States Supreme Court (Roberts, C. J., Alito, J., and Kavanaugh, J., in the *Mitchell* plurality; and Sotomayor, J., and Kagan, J., in the *McNeely* plurality) have joined an opinion acknowledging that—short of criminal conviction—states may use implied consent laws to impose a variety of adverse consequences on DUI arrestees who refuse blood testing.

8. On page 23, delete the first sentence of the last paragraph:

> Apart from the statute, we also find no constitutional error.

Insert in place of the deleted sentence indicated above the following substitute language:

We find neither statutory nor constitutional error in the giving of the CALCRIM No. 2130 instruction.

9. On page 23, in the last sentence of the last paragraph that begins "The defendant . . ." and continues on page 24, delete the word "also" so the sentence reads:

> The defendant in *Sudduth* relied on *Griffin v. California* (1965) 380 U.S. 609, the United States Supreme Court's landmark case prohibiting comment on a criminal defendant's failure to testify.

10. On page 29, in the last paragraph, after the first sentence that ends ". . . those in *Espinoza*" add a new sentence "There is no breath-testing issue here." so the first two sentences of the paragraph read:

> Here, of course, the facts differ from those in *Espinoza*. There is no breath-testing issue in this case.

11. On page 29, in the last paragraph, in the sentence that begins "*Espinoza* assumed, . . ." change the word "this" to "that" so the sentence reads:

> *Espinoza* assumed, without deciding, that under *Birchfield* (and despite the qualifying language used in that case), "civil penalties" (such as a license suspension) could not be imposed in that circumstance.

12. On page 29, in the last paragraph, in the sentence that begins "The present case . . ." after the phrase "similar issue" insert the phrase "to the "civil penalties" scenario referenced in *Espinoza*" and after "criminal trial" add the phrase ", not license suspension" so the sentence reads:

> The present case raises a similar issue to the "civil penalties" scenario referenced in *Espinoza*, though here we are dealing with the imposition of "evidentiary consequences" (*Birchfield, supra*, 579 U.S. at p. 477) (i.e., the instruction allowing an inference of consciousness of guilt) attending Bolourchi's refusal to submit to a warrantless blood test in a criminal trial, not license suspension.

4

13. On page 30, at the end of the second paragraph (which currently ends with the citation "(*Birchfield*, at p. 477.)"), add the new sentence "This case falls on the constitutionally permissible end of that continuum." so the last two sentences of the paragraph read:

> Applying a Fourth Amendment reasonableness standard, the court concluded that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." (*Birchfield*, at p. 477.)  This case falls on the constitutionally permissible end of that continuum.

14. On pages 30 and 31, delete in its entirety the paragraph that begins on page 30 with the phrase "In our view, . . . ." and ends on page 31, and replace it with the following paragraph:

> In our view, the *Birchfield* rule against criminalizing blood test refusals does not mean the imposition of *lesser* consequences is constitutionally unreasonable.  In our evaluation of the state of the law today, we view it as very significant that *Birchfield* upgraded the *McNeely* plurality's discussion of implied consent laws by embracing it in a full opinion of the court.  Echoing the *McNeely* plurality, the *Birchfield* court stressed that, "The States and the Federal Government have a 'paramount interest . . . in preserving the safety of . . . public highways.' " (*Birchfield*, *supra*, 579 U.S. at p. 464.)  Implied consent laws, which are designed to discourage drivers from driving while impaired (and to encourage cooperation with testing that aims to determine if a driver *is* impaired), "serve a very important function." (*Id.* at p. 466.)  Mindful of how the law has evolved on this point, we decline to extend *Birchfield* to prohibit the imposition of an evidentiary consequence for Bolourchi's refusal to submit to a blood test.  To the extent *Espinoza* can be read to support a contrary analysis, we respectfully disagree with it.

15. On page 32, in the last full paragraph, delete the following sentence:

> There is a throughline here.

Insert in place of the deleted sentence indicated above, continuing within the same paragraph, the following substitute language:

5

We acknowledge doing some reading of tea leaves in the pertinent United States Supreme Court opinions, but there is a throughline here.

16. On page 32, in the last sentence of the last full paragraph, after the phrase "see in all of", change the word "the" to "these"; change the phrase "United States Supreme Court's Fourth Amendment opinions addressing implied consent laws" to "opinions"; and change the phrase "supports this conclusion" to "supports our conclusion" so the sentence reads:

> The acknowledged validity of imposing adverse consequences on DUI testing refusers we see in all of these opinions, first in the *McNeely* plurality opinion, again in *Birchfield*, and again in the *Mitchell* plurality opinion—so long as the consequence is not a criminal conviction—supports our conclusion.

The modifications effect no change in the judgment.


Date: _____          _____ P.J.

6

Trial Court:        Superior Court of California, County of Marin

Trial Judge:       Hon. Beth S. Jordan

Counsel:           Heather E. Shallenberger, under appointment by the Court of Appeal, for Defendant and Appellant.

                      Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Bridget Billeter, Supervising Deputy Attorney General, and Julia Y. Je, Deputy Attorney General, for Plaintiff and Respondent.

Filed 6/28/24 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br>                          v.<br>HAADI BOLOURCHI,<br>    Defendant and Appellant. | A167289<br><br>(Marin County<br>Super. Ct. No. SC207297A) |

Under Vehicle Code[1] section 23612, subdivision (a)(1)(B), "A person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood for the purpose of determining the drug content of his or her blood, if lawfully arrested for" driving while under the influence of a drug in violation of section 23152, subdivision (f).[2] The question presented here is this: If, following a valid arrest for such an offense, a motorist refuses to cooperate in the taking of a blood test unless a warrant is first obtained, may the jury at the motorist's ensuing DUI trial draw an adverse inference of consciousness of guilt based on that refusal?

Our answer is yes. In this case, a jury convicted defendant Haadi Bolourchi of a DUI offense in violation of section 23152, subdivision (f), and

---

[1] Undesignated statutory references are to the Vehicle Code.

[2] We will sometimes use "DUI" to refer to driving under the influence of alcohol, a drug, or a combination.

1

bribing an executive officer. The trial court suspended imposition of sentence, placed Bolourchi on three years' probation, and ordered a jail term of 180 days. On appeal, Bolourchi contends the DUI conviction should be reversed. He argues the court erred by instructing the jury with CALCRIM No. 2130, an instruction that states a defendant's refusal to submit to a chemical test as required by California's implied consent statute (§ 23612) may show consciousness of guilt.

Seeing no instructional error, we affirm.[3]

## I. BACKGROUND

### A. *The Charges*

An information charged Bolourchi with driving under the influence of a drug with priors (§§ 23152, subd. (f), 23550, subd. (a); count 1) and bribing an executive officer (Pen. Code, § 67; count 2). Among the sentencing enhancement allegations for count 1 was a charge that Bolourchi willfully refused a peace officer's request to submit to a chemical test and willfully failed to complete that test. (§§ 23612, 23577, 23578.)

### B. *The Evidence Presented at Trial*

Officer Kevin Finerty testified as follows.

In the early morning hours of September 22, 2018, while on patrol in San Rafael, Officer Finerty noticed a black Dodge Challenger with tinted front windows, obscuring the driver. Loud noises were emitting from the car's rear exhaust. Both conditions violate the Vehicle Code. After the car rolled slowly over the crosswalk and into the middle of an intersection against a red light, Officer Finerty pulled behind it and activated his emergency lights. When the car failed to stop, he activated his siren.

---

[3] Because we find no instructional error, we need not address the parties' arguments as to whether the claimed error was prejudicial.

With Officer Finerty trailing close behind, the car proceeded 500 feet before pulling into the parking lot of a 7-Eleven store. The driver, Haadi Bolourchi, got out and began walking into the store, seemingly oblivious to the fact a patrol car with lights and siren activated had been behind him before he stopped. Officer Finerty directed Bolourchi to get back into his car, which Bolourchi refused to do, stating he did not consent to a search of the car. The officer found that odd, since he had not asked permission to search anything.

During the ensuing interactions between Officer Finerty and Bolourchi, Bolourchi exhibited a number of suspicious traits and behaviors suggesting paranoia and other indications of intoxication. His eyes were red and watery. His speaking tone was low and his speech was slow. And he said he was unaware Officer Finerty had pulled behind him, despite the lights and sirens immediately behind him before he pulled into the 7-Eleven lot.

Bolourchi gave a confused response to a simple question about where he was driving from and where he was going. He was unsteady on his feet. He failed to comply with multiple directions to sit on the ground, and had to be physically guided into a sitting position. He repeatedly asked the same questions about why he had been stopped even after being told he was suspected of Vehicle Code violations.

Faced with these various indications of intoxication, Officer Finerty conducted several field sobriety tests, including the horizontal gaze nystagmus test, the walk and turn test, the one-leg stand test, and the finger to nose test. Bolourchi's poor performance on a number of these tests

suggested that he was under the influence of drugs or alcohol, so Officer Finerty administered a preliminary alcohol screening (PAS) test.[4]

When the PAS results showed no evidence of alcohol use, Officer Finerty began to focus on possible drug intoxication. Bolourchi admitted to smoking cannabis the day before, and indicated he normally kept his cannabis in the trunk of his car. Officer Finerty replied that he was concerned whether Bolourchi had been driving while under the influence of cannabis, not where he normally stored it. " 'Yeah,' " said Bolourchi, seemingly in agreement with the officer's stated concern.

At that point, Officer Finerty arrested Bolourchi and placed him in the back of his patrol car. The officer then conducted an inventory search of Bolourchi's car. There were multiple packets of Swisher Sweets tobacco cigars in the car. According to Officer Finerty, people often replace the tobacco in these cigars with cannabis and smoke them. Also in the car was an empty pill container for the prescription drug Alprazolam. No cannabis was found on Bolourchi or in his car.

After driving Bolourchi to the police station, Officer Finerty told Bolourchi he was going to conduct a drug recognition evaluation (DRE). Bolourchi was still confused as to why he was there. The officer told Bolourchi that he believed he was under the influence of drugs, either prescription or nonprescription. Although Bolourchi adamantly denied that he was under the influence of prescription drugs, he did not deny driving under the influence of cannabis.

---

[4] "A preliminary alcohol screening test that indicates the presence or concentration of alcohol based on a breath sample in order to establish reasonable cause to believe the person was driving a vehicle in violation of Section 23140, 23152, or 23153 is a field sobriety test and may be used by an officer as a further investigative tool." (§ 23612, subd. (h).)

4

In conducting the DRE, Officer Finerty checked Bolourchi's vital signs. Bolourchi's blood pressure and body temperature were normal. His pulse was elevated, which is consistent with cannabis use. Bolourchi's pupils were normal in varying light. Officer Finerty testified it is possible for an individual to be under the influence of marijuana and still have normal blood pressure, body temperature, and pupil size.

Officer Finerty also administered the Modified Romberg Test to test Bolourchi's internal clock. During an elapsed period of 35 seconds, Bolourchi estimated 30 seconds had passed. The officer observed that the condition of Bolourchi's tongue was consistent with dry mouth and cannabis use and with smoking a cigar or a glass pipe. Bolourchi told Officer Finerty that on September 21, he had smoked approximately one gram of cannabis at 8:00 a.m. and again at 10:00 a.m., and he had taken some Alprazolam at 3:00 p.m.

Based on Bolourchi's physical condition, behavior, and performance on the field sobriety tests, Officer Finerty formed the opinion that Bolourchi was under the influence of cannabis and asked Bolourchi if he would consent to a blood test. Bolourchi agreed to have a blood sample taken but wanted it done at the jail and not at the police department.

Officer Finerty then drove Bolourchi to the county jail. But at the jail, Bolourchi stated that he did not want to have his blood drawn and wanted the officer to get a warrant for the blood test. Bolourchi also made statements to the effect that he wanted the officer to "work for [his] money." At this point, Officer Finerty drove Bolourchi back to the police department to obtain a warrant.

During the drive back to the police department, Bolourchi made a statement to the effect of " 'You can't get any tips?' " The officer was confused by Bolourchi's remark. Bolourchi then told the officer that he would pay him

5

$1,000 if he let him go. When Officer Finerty asked Bolourchi to confirm what he was saying, Bolourchi repeated that he would give the officer $1,000 if he let him go.

Bolourchi explained that the tow of his vehicle was only going to be $100 and that he would be paying the officer 10 times that amount. Officer Finerty did not think Bolourchi was joking, because "[h]e wasn't laughing. He and I weren't laughing back and forth or anything." Although Bolourchi did not have cash on his person, the officer believed that he was making a serious attempt to bribe him with $1,000.

Officer Finerty obtained a warrant for the blood test. The blood draw was performed at 5:57 a.m. The sample was sent to the Department of Justice for testing. Criminalist Cathralynn Cook testified about the results of that testing. Cook testified as an expert on the procedures and operations of the Department of Justice laboratory, blood analysis for the presence of drugs, and the effect of drugs on the human body and a person's ability to operate a vehicle.

According to Cook, Alprazolam is a central nervous system depressant and can cause impairment by slowing that system down. Common symptoms include lowered heart rate, pulse rate, and body temperature. It can also cause sleepiness, confusion, muscle relaxation, a slowed perception of time, and difficulties with spatial awareness. Both Alprazolam and THC (the active ingredient in marijuana) can affect a person's ability to do more than one task at a time, disrupting the divided-attention processing in the brain. Driving is a complex divided-attention task. The test of Bolourchi's blood sample showed "[t]he presence of Alprazolam," and "2.2-nanograms per milliliter of Delta 9-THC as well as Hydroxy-THC and Carboxy-THC." Cook was confident that the test results were reliable and trustworthy.

Cook described the additive effects when a person takes both THC and Alprazolam. Both substances can cause physical coordination issues, lowered heart rate, lowered blood pressure, sleepiness, relaxation, and confusion. The symptoms may be more pronounced if a person is using both substances. A person driving under the influence of THC may have difficulty modulating speed in relation to other objects, difficulty with lane positioning, weaving, not turning appropriately, and slowed reaction time. A person using Alprazolam may drive more slowly and have weaving and coordination issues.

The prosecutor posed a hypothetical involving a person whose performance on field sobriety tests paralleled Bolourchi's performance. Cook opined that the person was too impaired to drive safely. The prosecutor later added facts to the hypothetical paralleling Bolourchi's driving behavior, his actions prior to being contacted by Officer Finerty, his admissions of having taken Alprazolam and smoked marijuana, and the results of the DRE. Cook again opined the person was too impaired to drive safely.

On cross-examination, Cook confirmed that for the Alprazolam detected in Bolourchi's system, no concentration was determined. But she stated that her opinion about impairment was based on the totality of the circumstances and not solely on the level of the drug in the system. Cook also stated that the level of a drug in a person's system does not decrease consistently over time like alcohol. Cook agreed that a person who regularly used marijuana or Alprazolam might not be as impaired as a new user, but stated she would expect the tolerant user to perform normally on field sobriety tests, have an ordinary driving pattern, and have no symptoms of impairment.

Bolourchi did not testify, but he did call his own expert, Dr. Eugene Schoenfeld. Schoenfeld pointed out that, for Alprazolam, the blood test

results showed "detected," with no measured level shown, and that the detected level of THC simply indicated Bolourchi had smoked marijuana sometime in the past. According to Dr. Schoenfeld, these results were consistent with Bolourchi's statements to Officer Finerty that he took Alprazolam and consumed marijuana the previous day, not that he was impaired when Officer Finerty encountered him.

Dr. Schoenfeld saw nothing in Officer Finerty's reported observations of Bolourchi or in the testing results to indicate impairment. He did not specifically address Bolourchi's bad driving or his evident confusion and disorientation in the 7-Eleven parking lot. As for Bolourchi's poor performance on the field sobriety tests, Dr. Schoenfeld said that may be explained by simple nervousness, not impairment.

In closing argument, defense counsel denied that Bolourchi had any corrupt intent in offering money to Officer Finerty and said his statements about that, if true, were nothing more than "circumstantial evidence that Haadi Bolourchi is a jackass."

## C. *The CALCRIM No. 2130 Instruction and Dismissal of the Section 23577 Allegation*

Prior to trial, the prosecutor moved in limine to give a proposed jury instruction under CALCRIM No. 2130 that read as follows:

"The law requires that any driver who has been lawfully arrested submit to a chemical test at the request of a peace officer who has reasonable cause to believe that the person arrested was driving under the influence. [¶] If the defendant refused to submit to such a test after a peace officer asked him to do so and explained the test's nature to the defendant, then the defendant's conduct may show that he was aware of his guilt. If you conclude that the defendant refused to submit to such a test, it is up to you to decide

8

the meaning and importance of the refusal. However, evidence that the defendant refused to submit to a chemical test cannot prove guilt by itself."

Defense counsel objected to this instruction, arguing there was no "refusal" because "[t]hey have a blood test." The prosecutor argued Bolourchi was "stringing it out"—first by insisting that the test occur at the jail and then declining to test without a warrant—which "could be indicative of a guilty state of mind." Noting Bolourchi did not submit to the test without a warrant, the court granted the prosecutor's motion and stated it would give the instruction.

In a mid-trial conference to discuss jury instructions, defense counsel stated he did not agree with the inclusion of CALCRIM No. 2130. Counsel stated Bolourchi "did, to his knowledge and ability, submit. He gave a [breathalyzer] test. He went back and forth and eventually did submit to a blood test." The prosecutor responded that Bolourchi had refused and it was necessary to get a warrant. The court concluded that it would give the instruction and the parties could make their arguments to the jury. Defense counsel did not object to the wording of the instruction or request any modification to the instruction.

In a later discussion just before the court instructed the jury, defense counsel argued Bolourchi had not received a proper explanation about the blood test, so his conduct did not amount to a refusal that would indicate consciousness of guilt. After hearing argument, the court stated it was satisfied that the "nature of the test was explained," and it would give the instruction, with counsel free to make their respective arguments to the jury.

The prosecutor relied on the CALCRIM No. 2130 instruction in closing argument as one of a number of factors the jury could use to find Bolourchi was driving while under the influence of a drug. "The defendant didn't want

9

to take [a blood] test because he knew that it would show he was intoxicated. You can use that as a factor in deciding whether or not the defendant was intoxicated. He refused to take the test. [You c]an use that as evidence of the fact that he knew he was intoxicated."

During trial, the court granted the prosecution's motion to dismiss the enhancement allegation under section 23577 that Bolourchi refused a chemical test.

## D. *Guilt Verdict, Sentence and Appeal*

The jury found Bolourchi guilty on both counts 1 and 2 and at a subsequent bifurcated trial the court found sentencing allegations that Bolourchi suffered three prior DUI convictions to be true. At sentencing, the court suspended imposition of sentence, placed Bolourchi on three years' probation, and ordered that he serve 180 days in county jail.

Bolourchi timely appealed.

## II. DISCUSSION

At the outset, it is important to be clear about exactly what Bolourchi is now arguing. In the trial court, he took the position that his lack of cooperation in submitting to a blood test, *factually*, was not a refusal to test because he ultimately allowed his blood to be taken. But that position is unsustainable. It is well established that, to comply with the consent law, a " 'driver should clearly and unambiguously manifest the consent required by the law. Consent which is not clear and unambiguous may be deemed a refusal.' " (*Garcia v. Department of Motor Vehicles* (2010) 185 Cal.App.4th 73, 82.)

On appeal, Bolourchi continues to claim that consent is a question of fact, but the focus of his argument has shifted. He now argues that, *legally*, his lack of cooperation in a blood draw cannot amount to a refusal under the implied consent law, at least not a refusal for which any adverse

10

consequences may attach under CALCRIM No. 2130.  Specifically, Bolourchi contends he had a constitutional right under *Missouri v. McNeely* (2013) 569 U.S. 141 (*McNeely*) to demand that police obtain a warrant before he submitted to a blood draw, so his assertion of that right should not be deemed a refusal to test.

As an initial matter, the Attorney General argues Bolourchi forfeited this legal attack on the CALCRIM No. 2130 instruction by failing to object to it on precisely the same grounds he now urges on appeal.  In the trial court, Bolourchi contended there was no refusal because he eventually submitted to a blood draw, while here he argues there can be no refusal when an arrestee claims he has a Fourth Amendment right to be free from a coerced blood draw absent a warrant.

The issue Bolourchi raises is a matter of first impression in California. Without determining whether his objection below was sufficient to avoid forfeiture, we will review the merits of his claim and address whether the instruction affected his substantial rights.  (Pen. Code, § 1259; *People v. Jimenez* (2016) 246 Cal.App.4th 726, 730.)  For the reasons discussed below, we conclude the court did not err by giving the challenged instruction.

## A. *The Implied Consent Law*

The implied consent law states that a driver of a motor vehicle is "deemed to have given his or her consent" to blood or breath testing for alcohol, and to blood testing for drugs, upon a lawful arrest for DUI. (§ 23612, subd. (a)(1)(A) & (B).)  Specifically, when a person is lawfully arrested for driving under the influence of alcohol, the arresting officer is to give the person the choice of whether to take a blood test or a breath test. (§ 23612, subd. (a)(2)(A).)  If the arrest is for driving under the influence of a drug or the combined influence of alcohol and a drug, the officer initially is to offer the person the choice of a blood or breath test (*id.*, subd. (a)(2)(B)), but a

11

person who chooses a breath test may also be asked to take a blood test "if the officer has reasonable cause to believe that the person was driving under the influence of a drug or the combined influence of an alcoholic beverage and a drug and if the officer has reasonable cause to believe that a blood test will reveal evidence of the person being under the influence" (*id.*, subd. (a)(2)(C)).[5] In addition to blood and breath testing, a driver is in some circumstances deemed to have consented to urine testing. (*Id.*, subds. (a)(1)(B), (a)(2)(C), (d)(2).)

An arresting officer must advise the driver that failure to submit to the required "breath or urine testing" will result in a fine and mandatory imprisonment if the person is convicted of DUI (§ 23612, subd. (a)(1)(D)),[6] and that failure to submit to the required "breath, blood, or urine tests" will result

___

[5] Here, as noted, after the PAS test result showed Bolourchi had no alcohol in his blood, Officer Finerty suspected he had been driving while under the influence of a drug. After the officer arrested him, the record only shows the officer asked him to take a blood test, even though arguably he should have offered the alternative of a post-arrest breath test (§ 23612, subd. (a)(2)(B)) before asking for a blood test if Bolourchi chose breath testing. (*Id.*, subd. (a)(2)(C) ["A person who chooses to submit to a breath test may also be requested to submit to a blood test if the officer has reasonable cause to believe that the person was driving under the influence of a drug . . . and if the officer has reasonable cause to believe that a blood test will reveal evidence of the person being under the influence."].) On appeal, Bolourchi does not argue that this possibly skipped step provides a basis for reversal; he challenges only the court's instruction about his refusal when the officer asked him to take the blood test.

[6] Following the United States Supreme Court's decision in *Birchfield v. North Dakota* (2016) 579 U.S. 438 (*Birchfield*) (a case we discuss below), the Legislature amended section 23612 and related statutes in 2018 to eliminate criminal penalties for a refusal to submit to a blood test. (Assem. Bill No. 2717 (2017–2018 Reg. Sess.) (Assem. Bill No. 2717), Stats. 2018, ch. 177, §§ 1–3; see §§ 23577–23578.)

12

in the administrative suspension or revocation of driving privileges (*ibid.*). In addition, the officer must advise the person "that, in the event of refusal to submit to a test or tests, the refusal may be used against him or her in a court of law." (*Id.*, subd. (a)(4); see *People v. Alvarez* (2023) 98 Cal.App.5th 531, 547 (*Alvarez*) ["In a subsequent prosecution for driving under the influence, the court may . . . admit into evidence a driver's refusal to submit to such a test to show consciousness of guilt."]; CALCRIM No. 2130.)

## B. *Fourth Amendment Limits on Blood Tests*

CALCRIM No. 2130—the instruction challenged here—states a defendant's refusal to submit to a test required under the implied consent law "may show" the defendant "was aware of [his] guilt." As noted above, Bolourchi contends the use of this instruction was improper because he had a constitutional right under *McNeely*, *supra*, 569 U.S. 141 to demand that police obtain a warrant before he submitted to a blood draw. To evaluate this contention, we begin with a background discussion of a series of Fourth Amendment cases from the United States Supreme Court that, together, enunciate the applicable law.

We start in the mid-1960s with *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*). The case involved a forced blood draw from a DUI arrestee who lay hospitalized following an auto accident. (*Id.* at p. 758.) In light of delay caused by the need to investigate the accident, the police did not have time to procure a warrant and risked losing an accurate blood sample due to the gradual metabolization of any alcohol in the defendant's blood. (*Id.* at pp. 770–771.) The high court recognized the dignity and privacy interests at stake with any forced intrusion beyond the body's surface, but affirmed the resulting conviction on the ground the arresting officer "might reasonably have believed that he was confronted with an emergency, in which the delay

13

necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.' " (*Id.* at p. 770.)

There the law of this state stood for decades, with California courts uniformly holding the Fourth Amendment permits unconsented, warrantless blood draws in DUI investigations under the exigent circumstances exception recognized in *Schmerber*. (See *People v. Harris* (2015) 234 Cal.App.4th 671, 702.) But *McNeely*, decided in 2013, was a gamechanger. There, the high court held that the natural metabolization of alcohol in the bloodstream does *not* establish "a *per se* exigency" justifying an exception to the Fourth Amendment's warrant requirement in all drunk-driving cases. (*McNeely*, *supra*, 569 U.S. at p. 145.) Instead, the court held, "exigency in this context must be determined case by case based on the totality of the circumstances." (*Ibid.*)

*McNeely* is just as important for what it does decide as it is for what it does not decide. Exigency is only one of several recognized exceptions to the Fourth Amendment warrant requirement, and *McNeely* addresses only one of them—the exigency exception for emergency circumstances. (*McNeely*, *supra*, 569 U.S. at pp. 148–149.) In addition, while Justice Sotomayor's opinion for the five justice *McNeely* majority rejects the idea of per se exigency, she failed to garner a fifth vote for section III of the opinion discussing an issue relevant to this case—the power of the states to use implied consent laws to enforce their DUI laws consonant with the Fourth Amendment.

In Section III, the *McNeely* plurality states: "States have a broad range of legal tools to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws. For example, all 50 States have adopted implied consent laws that require motorists, as a

14

condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense.  [Citation.]  Such laws impose significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution."[7]  (*McNeely*, *supra*, 569 U.S. at pp. 160–161 (plur. opn. of Sotomayor, J.).)

Three years after *McNeely* clarified *Schmerber*'s application of the exigent circumstances exception for warrantless searches in DUI cases, the *Birchfield* court added another new element to Fourth Amendment law governing those searches.  Some of the other exceptions to the warrant requirement, unlike the exigent circumstances exception addressed in *Schmerber* and *McNeely*, apply categorically rather than on a totality of the circumstances, case-by-case basis.  *Birchfield* not only involved one of these categorical exceptions—the search-incident-to-arrest exception—but directly addressed implied consent laws as well.

The main issue in *Birchfield* was whether the Fourth Amendment limits the operation of state laws that impose penalties on drivers who refuse to undergo chemical testing required by implied consent laws.  (*Birchfield,*

---

[7] Both the California Supreme Court and the United States Supreme Court have rejected Fifth Amendment challenges to the admission of evidence or the giving of jury instructions permitting juries to draw adverse inferences against DUI defendants for their refusal to consent to blood-alcohol tests.  (See *People v. Sudduth* (1966) 65 Cal.2d 543, 546–547 (*Sudduth*); *South Dakota v. Neville* (1983) 459 U.S. 553, 554, 564 (*Neville*).)  Although we have no Fifth Amendment challenge in this case, we take these high court precedents as highly instructive in piecing together the applicable Fourth Amendment principles at issue here based on *McNeely* and *Birchfield*.

*supra,* 579 U.S. at pp. 443–444.) While the "typical penalty for noncompliance" "[i]n the past" was "suspension or revocation of the motorist's license," the North Dakota and Minnesota laws at issue in *Birchfield* went "beyond that and [made] it a crime for a motorist to refuse to be tested after being lawfully arrested for driving while impaired." (*Id.* at p. 444; see *id.* at pp. 449–450.) The court considered "whether such laws violate the Fourth Amendment's prohibition against unreasonable searches." (*Id.* at p. 444.)

Before the court in *Birchfield* were three defendants in three separate cases. In one, Birchfield was convicted of a crime for refusing to take a blood test (*Birchfield, supra,* 579 U.S. at pp. 454, 451); in another, Bernard was convicted of criminal refusal to take a breath test (*id.* at pp. 452–453); and in the third, Beylund submitted to a blood test, but when his driver's license was subsequently suspended in an administrative hearing, he argued his consent to the blood test was coerced because the arresting officer had warned him that refusing to consent would itself be a crime (*id.* at pp. 453–454). The Supreme Court granted certiorari in all three "to decide whether motorists lawfully arrested for drunk driving may be convicted of a crime or otherwise penalized for refusing to take a warrantless test measuring the alcohol in their bloodstream." (*Id.* at p. 454.)

After concluding that the search-incident-to-arrest doctrine does not justify the warrantless taking of a blood sample, the *Birchfield* court rejected the states' alternative argument that a DUI arrestee may be "deemed to have consented to submit to a blood test" in the face of threatened criminal penalties. (*Birchfield, supra,* 579 U.S. at p. 477.) "It is well established that a search is reasonable when the subject consents [citation], and that sometimes consent to a search need not be express but may be fairly inferred from context." (*Id.* at p. 476.) "Our prior opinions," said the court, "have

16

referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply. See, *e.g., McNeely, supra,* at 160–161 (plurality opinion); *Neville, supra,* at 560. Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them. [¶] It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test. There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads." (*Birchfield,* at pp. 476–477.)

The Supreme Court then applied these legal conclusions to the three cases before it. (*Birchfield, supra*, 579 U.S. at pp. 477–478.) The court held Birchfield could not be forced to submit to a warrantless blood test incident to his arrest. (*Ibid.*) Because there were no exigent circumstances or other bases to justify a warrantless blood test, the court held Birchfield was threatened with an unlawful search and reversed his conviction for refusing to submit to a blood test. (*Id.* at p. 478.) In contrast, a warrantless breath test was a permissible search incident to Bernard's arrest. "[T]he Fourth Amendment did not require officers to obtain a warrant prior to demanding the [breath] test, and Bernard had no right to refuse it." (*Ibid.*) Lastly, the court vacated Beylund's license suspension because the North Dakota Supreme Court had erroneously concluded the state could compel both blood tests and breath tests incident to arrest. (*Ibid.*) The high court remanded the case for a determination of whether Beylund's consent to the blood test was freely and voluntarily given in light of the inaccuracy of the officer's advisement. (*Ibid.* & fn. 9.)

The most recent United States Supreme Court case involving implied consent laws, *Mitchell v. Wisconsin* (2019) 588 U.S. 840 (*Mitchell*), applies *Birchfield* and *McNeely* to a category of cases involving unconscious DUI arrestees. The holding in *Mitchell*—that a warrantless blood draw generally is permissible where the arrestee's condition requires that he be taken to a hospital before the police have an opportunity to obtain a standard evidentiary breath test (*Mitchell*, at p. 857 (plur. opn. of Alito, J.))—is less pertinent here than its background statement of applicable constitutional principles. Echoing *Birchfield* and the *McNeely* plurality, *Mitchell* acknowledges the constitutional validity of imposing adverse consequences for blood testing refusals under implied consent laws. (*Mitchell,* at p. 847 (plur. opn. of Alito, J.).)

Speaking for a plurality of four justices in *Mitchell*, Justice Alito summarized the state of the law as follows: "We have held that forcing drunk-driving suspects to undergo a blood test does not violate their constitutional right against self-incrimination. [Citation.] Nor does using their refusal against them in court. [Citation.] And punishing that refusal with automatic license revocation does not violate drivers' due process rights if they have been arrested upon probable cause, [citation]; on the contrary, this kind of summary penalty is 'unquestionably legitimate.' " (*Mitchell, supra,* 588 U.S. at p. 847 (plur. opn. of Alito, J.).) When the *Mitchell* and *McNeely* pluralities and the *Birchfield* majority opinion are read together, five current justices on the United States Supreme Court have joined an opinion acknowledging that—short of criminal conviction—states may use implied consent laws to impose a variety of adverse consequences on DUI arrestees who refuse blood testing.

**C.** ***The Trial Court Did Not Err by Instructing with CALCRIM No. 2130 That Jurors Could Consider Bolourchi's Refusal as Evidence of Consciousness of Guilt***

Following *McNeely* and *Birchfield*, a warrantless blood test incident to a DUI arrest may not be justified under the Fourth Amendment based on the implied consent law alone. (*Alvarez*, *supra*, 98 Cal.App.5th at pp. 548–549 [actual consent, but not implied consent, justifies a warrantless blood draw].) "Taken together, 'the reasoning and analysis in *Birchfield* and *McNeely*, as well as other Fourth Amendment precedent, suggest that blood draws may only be performed after either obtaining a warrant, obtaining valid consent from the defendant, or under exigent circumstances with probable cause.' " (*Alvarez*, at p. 550.) In the present case, of course, Bolourchi's blood was not drawn until after the police obtained a warrant, so the Fourth Amendment did not limit the introduction of the blood test results into evidence, and Bolourchi makes no argument that the results were improperly admitted.

While the blood test ultimately performed here was permissible under the Fourth Amendment, the question presented in this case is what penalties or consequences may be imposed on Bolourchi for his refusal to submit to the test when no warrant had yet been obtained. Bolourchi contends he had a Fourth Amendment "right to demand a warrant before submitting to the blood draw," so his assertion of that right "cannot constitute a refusal under the law and, thus, cannot be used against him as evidence of his consciousness of guilt." He argues: "Since the instruction [CALCRIM No. 2130] improperly invited the jury to penalize [Bolourchi] for lawfully asserting his constitutional right, the giving of the instruction was error."

But as the Attorney General points out, the *Birchfield* court did not hold that the Fourth Amendment prohibits all penalties or consequences for a driver who refuses to submit to a blood test after a DUI arrest. Instead,

19

*Birchfield* held specifically that the imposition of criminal penalties for a refusal to submit to a blood test is not permitted.  (*Birchfield*, *supra*, 579 U.S. at pp. 476–477; see *id.* at p. 444.)  Applying the "reasonableness" standard that is "always the touchstone of Fourth Amendment analysis," the *Birchfield* court held that a driver "cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense."  (*Id.* at p. 477.)  Before stating this conclusion, however, the court emphasized it was not prohibiting states from imposing other consequences—specifically, "civil penalties and *evidentiary consequences*"—for a refusal to submit to a blood test.  (*Id.* at pp. 476–477, italics added.)  The court stated its "prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply," and "nothing we say here should be read to cast doubt on them."  (*Ibid.*)  Bolourchi does not mention or address this portion of *Birchfield* in his appellate briefs.

Here, Bolourchi was not punished criminally for his refusal to submit to a warrantless blood test.  Unlike the states whose laws were at issue in *Birchfield*, California has never " 'made it a stand-alone criminal offense for a DUI arrestee to refuse to submit to a chemical test.' "  (*Espinoza v. Shiomoto* (2017) 10 Cal.App.5th 85, 113, fn. 10 (*Espinoza*).)  In some circumstances, however, a refusal can result in increased criminal penalties for a driver convicted of DUI.  As the *Espinoza* court noted in 2017, "a motorist's refusal to submit to or failure to complete a chemical test, if pleaded and proven by the prosecutor, results in increased criminal penalties if the motorist is convicted of DUI in violation of section 23152 or 23153.  (§§ 23577, 23578.)" (*Espinoza*, at p. 113, fn. 10.)  But in 2018, to comply with *Birchfield*, the Legislature amended the relevant statutes to eliminate the increased

criminal penalties where a driver refuses to submit to a blood test, while leaving them in place for a refusal to submit to a breath or urine test. (§§ 23577, subds. (a), (c), 23578, 23612, subd. (a)(1)(D); Assem. Bill No. 2717, Stats. 2018, ch. 177, §§ 1–3, amending §§ 23577, 23578, 23612; see Legis. Counsel's Dig., Assem. Bill No. 2717 [stating *Birchfield* "held that a motorist cannot be punished criminally for his or her refusal to submit to a blood test[,]" but stating that "[t]he [*Birchfield*] court held that administrative penalties could be imposed for a refusal to submit to a blood test for those purposes"].)

In this case, the information charging Bolourchi with DUI included allegations that he refused to submit to a chemical test within the meaning of sections 23577 and 23578. Under the versions of the relevant statutes that were in effect when the information was filed in 2020 (i.e., after the 2018 amendments discussed above), the increased penalties authorized by sections 23577 and 23578 already did not apply to a refusal to take a blood test. (§§ 23577, subds. (a), (c), 23578, 23612, subd. (a)(1)(D).) But in any event, the trial court later granted the prosecutor's motion to dismiss the enhancement allegations for unrelated reasons,[8] and the allegations were not

---

[8] The prosecutor requested (and the court granted) the dismissal because the prosecutor had not introduced evidence as to whether Officer Finerty provided certain advisements to Bolourchi about the requested test and the implied consent law before Bolourchi refused to take the test. The court noted those advisements are required by the standard jury instruction governing *the refusal enhancement* (see CALCRIM No. 2131).

In contrast, detailed advisements are not a prerequisite to admission of *evidence of a refusal* to show consciousness of guilt in a prosecution for DUI. (*People v. Municipal Court (Gonzales)* (1982) 137 Cal.App.3d 114, 118; see CALCRIM No. 2130.) And as noted, the trial court later concluded the officer had sufficiently advised Bolourchi of "the nature of the test" to warrant

21

submitted to the jury. Thus, this case does not involve the imposition of criminal penalties for a refusal to submit to a blood test.

We are not persuaded by Bolourchi's suggestion that he should face *no* consequences for his lack of cooperation in submitting to a blood test, such as the court's instruction to jurors that, if they found a refusal occurred, the refusal "may show" Bolourchi was aware of his guilt of the DUI charge. As noted, *Birchfield* emphasized it was not holding that the Fourth Amendment prohibits such "evidentiary consequences" of a refusal. (*Birchfield*, *supra*, 579 U.S. at pp. 476–477.)

Bolourchi contends that, because the Fourth Amendment required police to obtain a warrant to conduct a blood draw, his lack of cooperation in submitting to the test before the warrant was obtained "cannot constitute a refusal *under the law* and, thus, cannot be used against him as evidence of his consciousness of guilt." (Italics added.) We disagree. First, to the extent Bolourchi suggests (by his reference to his rights "under the law") that, *under the implied consent statute*, his conduct could not constitute a refusal or carry any adverse consequences, he is incorrect.

In response to *Birchfield*, as noted above, see footnote 6, page 12 *ante*, our Legislature in 2018 amended sections 23577, 23578, and 23612 to eliminate the increased *criminal penalties* that previously applied in a DUI prosecution when the driver refused to take a blood test (while leaving those increased penalties in place for a refusal to take a breath or urine test). (§§ 23577, subds. (a), (c), 23578, 23612, subd. (a)(1)(D); Assem. Bill No. 2717, Stats. 2018, ch. 177, §§ 1–3.) But the Legislature did not change the underlying rule in the implied consent law that, in some circumstances, a

giving CALCRIM No. 2130 (entitled "Refusal—Consciousness of Guilt") but not CALCRIM No. 2131 (entitled "Refusal—Enhancement").

22

driver who is lawfully arrested for DUI is deemed to have consented to, and must submit to, a blood test. (§ 23612, subd. (a)(1)(B), (2)(C).) There is no statutory right not to submit to a blood test in this circumstance.

And the implied consent law continues to contemplate that a driver who refuses to submit to a statutorily required blood test may face consequences (other than criminal penalties) for the refusal. An arrested person is to be told that his or her driving privileges may be administratively suspended or revoked. (§ 23612, subd. (a)(1)(D) [consequences of failure to submit to "the required breath, blood, or urine tests"]; see § 13353, subd. (a)(1)–(3).) The arrested driver is also to be advised that a "refusal to submit to a test or tests" "may be used against him or her in a court of law." (§ 23612, subd. (a)(4).)

As the Attorney General notes, where there is a *statutory right* to refuse a particular test, it is error to admit evidence of the refusal. (*People v. Jackson* (2010) 189 Cal.App.4th 1461, 1466 [error to admit evidence of defendant's refusal to take PAS test, because § 23612 granted the right to refuse].) But Bolourchi had no statutory right to refuse to take a post-arrest blood test, and the implied consent statute does not prohibit instruction or comment on his refusal. As a statutory matter, he is simply incorrect that a refusal to take a blood test "cannot constitute a refusal under the law and, thus, cannot be used against him as evidence of his consciousness of guilt."

Apart from the statute, we also find no constitutional error. Notably, an instruction similar to CALCRIM No. 2130 was considered and upheld against a constitutional challenge in *Sudduth, supra,* 65 Cal.2d at page 547 and footnote 5. *Sudduth,* a DUI case, did not involve a blood draw—it involved a breath test—but it drew upon the reasoning in *Schmerber* (*id.* at p. 546) and thus is instructive here. The defendant in *Sudduth* also relied on

23

*Griffin v. California* (1965) 380 U.S. 609, the United States Supreme Court's landmark case prohibiting comment on a criminal defendant's failure to testify.

The challenged instruction in *Sudduth* read in part as follows: " 'The fact that such test is refused under such circumstances is not sufficient standing alone and by itself to establish the guilt of a defendant but is a fact which if proven may be considered by you in the light of all other proven facts in deciding the question of guilt or innocence. Whether or not such conduct shows a consciousness of guilt and the significance to be attached to such a circumstance are matters for your determination.' " (*Sudduth*, *supra*, 65 Cal.2d at p. 547, fn. 5.)

Chief Justice Traynor's opinion for the court in *Sudduth* explained: "The sole rationale for the rule against comment on a failure to testify is that such a rule is a necessary protection for the exercise of the underlying privilege of remaining silent [citation]. A wrongful refusal to cooperate with law enforcement officers does not qualify for such protection. A refusal that might operate to suppress evidence of intoxication, which disappears rapidly with the passage of time [citation], should not be encouraged as a device to escape prosecution." (*Sudduth*, *supra*, 65 Cal.2d at p. 546.)

Citing *Sudduth* as a leading precedent, the United States Supreme Court reached a similar conclusion in *Neville*, *supra*, 459 U.S. at pages 554, 560, 564. "[T]he values behind the Fifth Amendment are not hindered when the State offers a suspect the choice of submitting to the blood-alcohol test or having his refusal used against him. The simple blood-alcohol test is so safe, painless, and commonplace, [citation], that respondent concedes . . . the State could legitimately compel the suspect, against his will, to accede to the test. Given, then, that the offer of taking a blood-alcohol test is clearly legitimate,

24

the action becomes no *less* legitimate when the State offers a second option of refusing the test, with the attendant penalties for making that choice." (*Neville*, at p. 563.)

In holding it was proper to instruct on consciousness of guilt or admit evidence of the defendant's refusal to test, *Sudduth* and *Neville* both focused on the fact the defendant had no underlying Fifth Amendment right to refuse a chemical test. (*Neville*, *supra*, 459 U.S. at pp. 560, fn. 10, 563; see *Sudduth*, *supra*, 65 Cal.2d at p. 547.) Presumably recognizing it has long been settled that a refusal to submit to chemical examination does not fall within the purview of the Fifth Amendment, Bolourchi's contention here is that, under *McNeely*, he had an underlying Fourth Amendment right to refuse to submit to a warrantless blood test, so an instruction allowing an inference of guilt based on the refusal should be found to be improper.

Bolourchi draws our attention to *Espinoza*, *supra*, 10 Cal.App.5th 85, where a Fourth District, Division Two panel noted some uncertainty about whether civil consequences for refusal to take a blood test (there, the administrative suspension of a driver's license) were still permitted after *McNeely* and *Birchfield*. (*Espinoza*, at pp. 113–114.) In that case, a California Highway Patrol (CHP) officer arrested a driver (Espinoza) for DUI and informed her that, pursuant to the implied consent law, she had to submit to a blood or breath test. (*Espinoza*, at p. 94.) Espinoza, after stating she was a public defender, referred to *McNeely* and made statements to the effect that she would submit to a blood test, but only if police obtained a warrant. (*Espinoza*, at pp. 93–94.) The arresting officer told Espinoza that her willingness to submit to a blood test with a warrant would be treated as a refusal. (*Id.* at p. 94.) The officer also stated the CHP's policy was to obtain warrants for forced blood draws only in felony DUI cases, and that no

25

warrant would be requested in Espinoza's case. (*Ibid.*) No warrant was obtained, so no blood test was taken. (*Ibid.*) In addition, Espinoza did not submit to a breath test. (*Ibid.*)

Following administrative proceedings, Espinoza's driver's license was suspended for one year for refusal to submit to a chemical test as required by the implied consent law. (*Espinoza*, *supra*, 10 Cal.App.5th at p. 96.) The superior court denied Espinoza's petition for writ relief (*id.* at pp. 96–97), and Espinoza appealed (*id.* at p. 97). Espinoza argued she did not refuse to submit to a chemical test. (*Id.* at p. 103.) She contended "she had a right under *McNeely* to force the police to obtain a warrant before they could seize her blood for testing and, therefore, her standing on her rights did not constitute a refusal to submit to a chemical test" under the implied consent law. (*Id.* at pp. 103–104.)

The appellate court rejected Espinoza's argument, stating: "Although Espinoza had a constitutional right to be free from a warrantless, *coerced* search of her blood incident to her lawful arrest, she had no such right with respect to a breath test. When Espinoza was told the policy of the CHP was to obtain warrants for forced blood draws only in felony DUI cases, and that a warrant would not be obtained in her case, Espinoza was required to choose a breath test. Espinoza's purported consent to a blood draw, to the exclusion of a breath test, constituted refusal to submit to a chemical test." (*Espinoza*, *supra*, 10 Cal.App.5th at p. 104.)

The *Espinoza* court explained that, under the implied consent law, a driver who provides only conditional, or purported, consent when requested to submit to a chemical test is deemed to have refused the test. (*Espinoza*, *supra*, 10 Cal.App.5th at pp. 104–105.) Espinoza's position that she would consent to a blood test only if the officer obtained a warrant "did not

26

constitute clear and unequivocal consent to a chemical test and, therefore, was not actual consent." (*Id.* at p. 105.) Relying in part on the fact Espinoza also did not submit to a *breath* test, the appellate court concluded that "Espinoza's purported consent to a blood test, and her failure to submit to and complete a breath test, constituted refusal to submit to a chemical test." (*Id.* at p. 112.)

In *Espinoza*, the Department of Motor Vehicles (Department) argued Espinoza's refusal to submit to a blood test was a sufficient basis for the license suspension, and there was no need to address breath tests. (*Espinoza, supra,* 10 Cal.App.5th at p. 112.) The *Espinoza* court stated it would have agreed with this position prior to *Birchfield*. (*Espinoza*, at p. 113.) The *Espinoza* court went on to state, however, "it is unclear whether the high court would approve of a civil license suspension based solely on a motorist's refusal to submit to a warrantless blood test." (*Ibid.*)

Elaborating on this point, the *Espinoza* court noted that, under *Birchfield* and *McNeely*, "[t]he police could not force Espinoza to submit to a blood test against her will unless they obtained a warrant or showed there were exigent circumstances that justified a warrantless search." (*Espinoza, supra,* 10 Cal.App.5th at p. 113.) The *Espinoza* court stated: "Consequently, we assume without deciding, that Espinoza could refuse to submit to a warrantless blood test unless the police obtained a warrant, and that, without more, her refusal to do so could not result in her license being suspended." (*Ibid.*)

But Espinoza's failure to submit to a *breath* test provided a valid basis to suspend her license. The *Espinoza* court stated that, under *Birchfield*, "the Fourth Amendment does not prohibit the police from forcing a motorist to submit to a warrantless *breath* test incident to his or her arrest, the motorist

27

has no right to refuse to submit to a breath test or to condition his or her submission on the police obtaining a warrant, and the motorist's refusal to submit to the breath test may be the basis of criminal penalties. [Citation.] In light of that clear holding, we conclude refusal to submit to a breath test incident to arrest may also be the basis of imposing civil penalties under the implied consent law, including suspension or revocation of the motorist's driver's license." (*Espinoza*, *supra*, 10 Cal.App.5th at p. 113.)

In so holding, the *Espinoza* court addressed an argument by the Department that *Birchfield* did not apply to the civil penalties in Espinoza's case, because *Birchfield* only addressed criminal liability for refusing to submit to a chemical test. (*Espinoza*, *supra*, 10 Cal.App.5th at p. 113.) We acknowledge that the discussion on this point in *Espinoza* gestures toward the analysis Bolourchi urges us to adopt in this case. According to the *Espinoza* court, "the Department contends the high court in *Birchfield* expressly stated it was not holding that *civil* penalties could not be imposed if a motorist refuses to submit to a chemical test." (*Id.* at pp. 113–114.) The *Espinoza* court was not persuaded that the passage on this point in *Birchfield* (a passage we have discussed above) established the propriety of imposing civil penalties for a refusal to submit to a warrantless blood test, so the *Espinoza* court instead grounded its decision on Espinoza's refusal to submit to a breath test. (*Espinoza*, at p. 114.)

The *Espinoza* court explained its reasoning as follows: "True, the court in *Birchfield* stated its 'prior opinions have referred approvingly to the *general* concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply,' and that 'nothing we say here should be read to cast doubt on them.' [Citations.] But the legality of *civil* penalties for refusing to submit to a warrantless blood test

was not squarely presented in *Birchfield*. (See [*People v. Harris, supra,* 234 Cal.App.4th at p. 684] [' " ' "It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered." ' " '].) We remain somewhat doubtful whether the high court would approve of a civil license suspension predicated solely on a motorist's refusal to submit to a warrantless *blood* test. Rather than decide whether Espinoza's license could be lawfully suspended based solely on her refusal to submit to a warrantless blood test, we conclude her license was lawfully suspended because she did not submit to a warrantless breath test." (*Espinoza, supra,* 10 Cal.App.5th at p. 114.)

Here, of course, the facts differ from those in *Espinoza*. By the time Bolourchi was arrested, he was suspected of driving under the influence of a drug rather than alcohol, and the only test he was offered and refused to take was a warrantless blood test. *Espinoza* assumed, without deciding, that under *Birchfield* (and despite the qualifying language used in that case), "civil penalties" (such as a license suspension) could not be imposed in this circumstance. (*Espinoza, supra,* 10 Cal.App.5th at pp. 113–114.) The present case raises a similar issue, though here we are dealing with the imposition of "evidentiary consequences" (*Birchfield, supra,* 579 U.S. at p. 477) (i.e., the instruction allowing an inference of consciousness of guilt) attending Bolourchi's refusal to submit to a warrantless blood test in a criminal trial. Whatever may be the case for the civil penalty of license suspension, we believe a DUI arrestee may be constitutionally required to face an adverse inference at his trial on a DUI charge as a cost of refusing a blood test.

As we read *Birchfield*, that case does not prohibit the imposition of such evidentiary consequences—here in the form of the CALCRIM No. 2130 instruction Bolourchi's jury was given.  As noted, the *Birchfield* court did not lump together all potential consequences of a refusal and hold the Fourth Amendment prohibits all of them.  (*Birchfield*, *supra*, 579 U.S. at pp. 476–477.)  Instead, the court prohibited only "criminal penalties" (*id.* at p. 477), and, while the court did not expressly hold that other consequences are permissible, it stated that its opinion should not "be read to cast doubt on" "implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply."  (*Id.* at pp. 476–477.)  Bear in mind that here the only criminal penalty sought for Bolourchi's refusal, the section 23577 sentencing enhancement allegation, was dismissed before his case went to the jury.

The *Birchfield* court's language suggests it viewed the different consequences as part of a continuum, with the most severe consequence (criminal penalties) violating the Fourth Amendment because "[t]here must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads."  (*Birchfield*, *supra*, 579 U.S. at p. 477.)  Applying a Fourth Amendment reasonableness standard, the court concluded that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense."  (*Birchfield*, at p. 477.)

In our view, that does not mean the imposition of *lesser* consequences is unreasonable.  In a different portion of its opinion, the *Birchfield* court stressed that, "The States and the Federal Government have a 'paramount interest . . . in preserving the safety of . . . public highways.' "  (*Birchfield*, *supra*, 579 U.S. at p. 464.)  Implied consent laws, which are designed to

30

discourage drivers from driving while impaired (and to encourage cooperation with testing that aims to determine if a driver *is* impaired), "serve a very important function." (*Id.* at p. 466.) In light of the important government interests involved, we decline to extend *Birchfield* to prohibit the imposition of an evidentiary consequence for Bolourchi's refusal to submit to a blood test. To the extent *Espinoza* can be read to support a contrary analysis, we respectfully disagree with it.

Finally, we note that, although *Espinoza* expressed uncertainty in 2017 about the reach of the 2016 *Birchfield* decision, the Legislature in 2018 enacted statutory amendments reflecting an understanding that, while *Birchfield* prohibits criminal penalties for a refusal to submit to a blood test, there is no constitutional requirement that such a refusal must have no consequences at all. (Assem. Bill No. 2717, Stats. 2018, ch. 177, §§ 1–3; see Legis. Counsel's Dig., Assem. Bill No. 2717 [*Birchfield* prohibits criminal penalties, but not administrative penalties, for refusal to submit to a blood test]; § 23577, subd. (c) ["The penalties in this section [increased criminal penalties for refusal to submit to a breath or urine test] do not apply to a person who refused to submit to or complete a blood test pursuant to Section 23612. This section does not prohibit imposition of administrative actions involving driving privileges."].) Thus, the Legislature does not appear to share Bolourchi's view that DUI arrestees may freely refuse to submit to blood draws and expect to avoid not only criminal conviction but all other adverse consequences for the refusal.

\*   \*   \*

In sum, we reject Bolourchi's argument that the CALCRIM No. 2130 instruction given in this case "improperly invited the jury to penalize [him] for lawfully asserting [a] constitutional right" to refuse consent to a

warrantless blood draw.  The *Birchfield* court made clear it was not recognizing an unqualified Fourth Amendment right (1) to refuse to take a blood test, and (2) to be free of any consequences flowing from the refusal. (*Birchfield, supra,* 579 U.S. at pp. 476–477.)  Instead, the *Birchfield* court concluded only that, applying a Fourth Amendment reasonableness standard, "motorists cannot be deemed to have consented to submit to a blood test *on pain of committing a criminal offense.*"  (*Birchfield,* at p. 477, italics added.)

Birchfield did not prohibit (and stressed it did not intend to "cast doubt" on) implied consent laws that impose civil penalties and evidentiary consequences.  (*Birchfield, supra,* 579 U.S. at pp. 476–477.)  There is a throughline here.  The acknowledged validity of imposing adverse consequences on DUI testing refusers we see in all of the United States Supreme Court's Fourth Amendment opinions addressing implied consent laws, first in the *McNeely* plurality opinion, again in *Birchfield,* and again in the *Mitchell* plurality opinion—so long as the consequence is not a criminal conviction—supports this conclusion.

## III. DISPOSITION

The judgment is affirmed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
HITE, J.*

---

* Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:        Superior Court of California, County of Marin

Trial Judge:        Hon. Beth S. Jordan

Counsel:            Heather E. Shallenberger, under appointment by the Court
                    of Appeal, for Defendant and Appellant.

                    Rob Bonta, Attorney General, Lance E. Winters, Chief
                    Assistant Attorney General, Jeffrey M. Laurence, Senior
                    Assistant Attorney General, Bridget Billeter, Supervising
                    Deputy Attorney General, and Julia Y. Je, Deputy Attorney
                    General, for Plaintiff and Respondent.